**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| BRYCE F. LOCKWOOD, Plaintiff, | ) | |
| v. | ) | No. 06-543C (Judge Horn) |
| THE UNITED STATES, Defendant. | ) | |

**JOINT STATEMENT OF FACTS AND ISSUE**

Pursuant to the Court's December 7, 2006 Scheduling Order, as amended from time to time, the parties submit the following Joint Statement Of Facts And Issue. Pursuant to the Court's instructions during the telephonic status conference held on June 20, 2007, the factual statement is divided into three parts: (1) the parties' joint statement of facts upon which they could agree (pp. 2-13); (2) the plaintiff's separate statement of additional facts[1] (pp. 14-56); and (3) the defendant's separate statement of additional facts (pp. 56-60).

[1] DEFENDANT'S STATEMENT REGARDING PLAINTIFF'S FACTS: The defendant cannot stipulate to the Plaintiff's Facts as stated, for a number of reasons. Generally, after reviewing every citation the plaintiff has provided, the defendant cannot represent to the Court that each record citation adequately and accurately supports the proposition stated. Where the plaintiff has quoted material, the defendant generally does not disagree with the accuracy of the transcription (excusing the occasional typographical error). However, in some instances, the defendant and the plaintiff could not agree upon the format of the presentation (specifically, the completeness of the quotations from Mr. Lockwood's military fitness reports stated at paragraph 118) and the parties chose to set forth those facts separately. In many other instances, the plaintiff cites to his own applications to the Board for Correction of Naval Records, various affidavits submitted in connection with his proceedings before the board, and even publications addressing U.S.S. Liberty, and asserts that the statements contained in those applications and affidavits must be accepted for the truth of the matters asserted. While the defendant can and does stipulate that the plaintiff lodged all of these materials with the board, it cannot stipulate to the facts asserted therein and thereby create a Government record of events that occurred 40 years ago when it appears that no contemporaneous record supporting the plaintiff's version of those events exists. Finally, the defendant cannot stipulate to the hortatory and argumentative language in any of the Plaintiff's Facts.

## JOINT ISSUE

Whether the Court lacks jurisdiction to entertain Lockwood's claim because it is barred by the statute of limitations.

## JOINT FACTS

***Plaintiff's Military Service and Discharge, Generally***

1. The plaintiff, Bryce F. Lockwood, is 66 years old and a former gunnery sergeant in the Marine Corps who served 13 years, 3 months between April 1, 1959 and June 30, 1972. Administrative Record ("AR") 171, 238 (duplicate).[2]

2. Mr. Lockwood received numerous medals and awards for his service. He holds the Silver Star, the Combat Action Ribbon, the Navy Unit Citation, the Vietnam Service Medal (with 3 stars), the Meritorious Unit Citation, the Vietnam Campaign Medal, and the Good Conduct Medal (with 3 stars). AR 171, 238.

3. In and prior to 1967, Mr. Lockwood was a member of the Naval Security Group, assigned duties as a Russian Language translator. AR 171, 238.

4. On June 8, 1967, Mr. Lockwood was serving as a member of the Naval Security Group analysts conducting their operations in their assigned stations below deck in the communication spaces aboard the U.S.S. Liberty. AR 285.

5. The U.S.S. Liberty was attacked by Israeli armed forces on June 8, 1967 while Mr.

---

[2] Citations to the Administrative Record refer to the Administrative Record filed in this case by the defendant on January 3, 2007, docket no. 17.

Lockwood was aboard the ship. Mr. Lockwood was decorated with the Silver Star for his actions during and after the attack. The citation for Mr. Lockwood's Silver Star describes the attack and his actions:

> For heroic achievement in connection with the unprovoked and unexpected armed attack on USS Liberty (AGTR 5) in Eastern Mediterranean on 8 June 1967. During the early afternoon hours, USS Liberty, while engaged in peaceful operations in international waters, was attacked without warning by jet fighter aircraft and three motor torpedo boats. The Liberty was subjected to intense incendiary, machine gun, and rocket fire and was placed in extreme jeopardy by a torpedo hit below the waterline on the starboard side in the vicinity of the Research compartment. Severe structural damage and extensive personnel casualties were incurred. Staff Sergeant Lockwood, serving with USS Liberty on temporary additional duty, was in the Research Operations space at the time of the attack, After the torpedo attack, Staff Sergeant Lockwood, despite severe burns, the rapid rise of water, heavy smoke and complete darkness, was instrumental in the rescue of personnel from the flooded compartments, thus averting even further loss of life. Without regard for his personal safety or his injuries, he assisted in the rescue until ordered to leave. His calm, rational thinking and actions evidenced a high degree of professional competence and moral fibre. After the attack and again without regard for his own injuries and comfort, Staff Sergeant Lockwood spent long tedious hours assisting in the care of the wounded and in whatever duties were required. Staff Sergeant Lockwood's initiative and courageous actions were in keeping with the highest traditions of the United States Naval Service.

AR 210, 285, 1080, 1199 (all copies of Lockwood's Silver Star Citation).

6. Lockwood's military medical records for June 9, 1967, indicate that he received a "wound, shrapnel, frontal scalp," and "flash burns, 1st and 2d degree, face and scalp." AR 1424. Those records also state that "[t]he patient has been hospitalized while his wounds were evaluated. Each wound was debrided and twice daily wet dressings were initiated. The patient

was given tetanus toxoid and he received daily parental [peniellia] and [etymptomycin] for 7 days. The patient has been instructed in the proper care of his wounds," and he was discharged on June 16, 1967. AR 1424-1425. His military medical records for June 19, 1967, indicate that Mr. Lockwood received x-rays of his skull and thigh to "pinpoint [the] location & size of residual [shrapnel] fragments." AR 1425.

7. Mr. Lockwood received the "Marine of the Month -- Bremerhaven, Germany" award for October, 1967. AR 1320, 1421 (duplicate).

8. On April 14, 1972, Mr. Lockwood received a Physical Evaluation Board ("PEB"). The PEB found Mr. Lockwood unfit for duty because of physical disability with a diagnosis of Arthralgia, underlying etiology not determined at present, with a rating of 20%, and recommended for discharge. AR 171, 175, 238.

9. Mr. Lockwood did not appeal the recommended actions in his PEB. [There is no document in the AR evidencing this, but the plaintiff admits this fact].

10. On June 30, 1972, Mr. Lockwood was honorably discharged from the Marine Corps for physical disability and paid $15,710.84 disability severance pay. AR 171.

***Mr. Lockwood's Fitness Reports and Performance Ratings between 1965 and 1972***

11. Mr. Lockwood received a performance rating of "Above Average" on his fitness report for the evaluation period of May 16, 1965 through June 28, 1965. AR 1335-1336.

12. Mr. Lockwood did not receive a performance rating on his fitness report for the

evaluation period of June 29, 1965 through July 31, 1965, because the reviewing officer did not have "sufficient opportunity to properly evaluate Sgt. Lockwood" due the shortened review period. AR 1333-1334.

13. Mr. Lockwood received a performance rating of "Above Average to Excellent" on his fitness report for the evaluation period of August 1, 1965 through January 31, 1966. AR 1331-1332.

14. Mr. Lockwood received a performance rating of "Above Average to Excellent" on his fitness report for the evaluation period of February 1, 1966 through July 31, 1966. AR 1328-1330.

15. Mr. Lockwood received a performance rating of "Above Average to Excellent" on his fitness report for the evaluation period of August 1, 1966 through September 30, 1966. AR 1326-1327. AR 1324-1325.

16. Mr. Lockwood received a performance rating of "Above Average to Excellent" on his fitness report for the evaluation period of October 1, 1966 through January 31, 1967. AR 1324-1325.

17. Mr. Lockwood received a performance rating of "Excellent" on his fitness report for the evaluation period of February 1, 1967 through July 31, 1967. AR 1321-1323. The comments on this fitness report state, among other things, that he is a "mature thoughtful person ... capacity to handle ever increasing responsibilities ... His care for his family, and his concern for

doing the honest decent thing in all his relationships makes him a real asset." Id.

18. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for the evaluation period of August 1, 1967 through November 27, 1967. AR 1317-1319. The comments on this fitness report state, among other things, that he is an "[u]nusually fine example of Marine ... striving for perfection ... growth potential to the highest enlisted ... ranks. ... the motivating force ... highly qualified." Id.

19. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for the evaluation period of November 18, 1967 through January 31, 1968. AR 1314-1316. The comments on this fitness report state, among other things, that he is "[w]ithout peer in his section ... predominant force because of his professional attitude ... ready volunteer... very dedicated to [the] Corps ... Sailor/Marine of the month ... outstanding growth potential." Id.

20. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for the evaluation period of February 1, 1968 through July 31, 1968. AR 1311-1313. The comments on this fitness report state, among other things, that he "strives for perfection ... one of most technically proficient ... growth potential outstanding." Id.

21. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for the evaluation period of August 1, 1968 through January 20, 1969. AR 1309-1310. The comments on this fitness report state, among other things, that he possesses "dedication ... impeccable bearing ... [and is an] outstanding representative." Id.

22. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for his assignment to Rota, Spain, during the evaluation period of August 15, 1968 through September 15, 1968. AR 1306-1308. The comments on this fitness report state, among other things, that he is a "quick learner ... duties tedious... extra (Work) requirement cheerfully and willingly ... sound judgement." Id.

23. Mr. Lockwood received a performance rating of "Above Average to Excellent" on his fitness report for the evaluation period of January 21, 1969 through May 1, 1969. AR 1304-1305.

24. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for the evaluation period of May 2, 1969 through July 13, 1969. AR 1301-1303. The comments on this fitness report state, among other things, that he is "well informed ... possessing keen sense of loyalty .... [and has] integrity of the highest order." Id.

25. Mr. Lockwood received a performance rating of "Excellent" on his fitness report for the evaluation period of July 14, 1969 through September 22, 1969.[3] AR 1296-1298. Mr. Lockwood received a combat award for his service in Vietnam during this period, and also received his Silver Star during this period. Id. The comments on this fitness report state, among other things, that he "consistently and conscientiously moves in right direction [and is] extremely successful in working with others." AR 1297-1298.

---

[3] During the period of July 14, 1969 through July 26, 1969, Mr. Lockwood's performance was "not observed," and he therefore did not receive a fitness report rating for that period. AR 1299-1300.

26. Mr. Lockwood received a performance rating of "Excellent to Outstanding" on his fitness report for the evaluation period of September 23, 1969 through January 31, 1970. AR 1291-1293. During the period of February 1, 1970 through February 19, 1970, Mr. Lockwood's performance rating was the same. AR 1294-1295. The comments on this fitness report state, among other things, that he was "thoroughgoing and conscientious... showed superlative judgement." AR 1292-1293.

27. Mr. Lockwood received a performance rating of "Excellent" on his fitness report for the evaluation period of February 20, 1970 through May 31, 1970. AR 1288-1290. This is the first period where Mr. Lockwood was rated as a Gunnery Sergeant, and the comments state, among other things, that he "produces excellent results." Id.

28. Mr. Lockwood received a performance rating of "Above Average" on his fitness report for the evaluation period of June 1, 1970 through November 30, 1970. AR 1286-1287. The fitness report also contained the following handwritten note:

> GySgt Lockwood is a relatively junior GySgt who has the potential to become Excellent to Outstanding. He is eager for new or diverse assignments but not adjusted yet to properly supervising until completion. He has a good knowledge of his MOS and is qualified in it for advancement.

AR 1287.

29. Mr. Lockwood received a performance rating of "Above Average" on his fitness report for the evaluation period of December 1, 1970 through July 15, 1971. AR 1284-1285. The fitness report also contained the following handwritten note:

> GySgt Lockwood has an above average knowledge of the analytical techniques of his MOS. He has on occasion not given as much support to his seniors as I would like to see. He takes a lot of personal pride in his appearance is seldom less than outstanding in his personal grooming. GySgt Lockwood is qualified for advancement.

AR 1285.

30. Mr. Lockwood received an initial Medical Board on June 30, 1971, which established a diagnosis of Arthralgia, underlying etiology unknown, incurred in line of duty, determined this might be a permanent condition, and found him fit to return to duty. AR 172, 173, 248. On June 30, 1971, Mr. Lockwood waived his right to appeal the medical board findings and returned to duty. AR 174.

31. Mr. Lockwood received a performance rating of "Above Average to Excellent" on his fitness report for the evaluation period of July 16, 1971 through November 30, 1971. AR 1281-1283. The fitness report also contained the following handwritten note:

> This Staff NCO is engaged in an analytical function of sensitive joint operations, vital to the security of our nation. As supervisor of a watch within his Division, Gunnery Sergeant Lockwood capably directs the efforts of his men toward mission accomplishment. His section has compared most favorably with other sections within his division (see attached addendum). The results of his sections efforts are usually outstanding and reflect well on his supervisory ability. The morale of his men is high and he enjoys a good rapport with all those with whom he associates. Not inclined to offer his considerable talents towards achievement of Company Marine Corps associated objectives but none the less will perform a commendable job when called upon. Concerned with his educational betterment he is enrolled in M.C.I. and is presently taking a course in "Construction Blue Print Reading." Well qualified in his duty MOS, he is qualified for promotion to Master Sergeant.

AR 1282-1283.

32. Mr. Lockwood's performance rating for the period of December 1, 1971 through May 31, 1972 does not contain an overall performance rating, but does contain a handwritten note stating:

> This Staff NCO is engaged in an analytical function of sensitive operations vital to the security of our nation. Gy/Sgt Lockwood has been recommended for separation from the service by the "Central Physical Evaluation Board" for reasons of contracting "Arthralgia." A highly intelligent Marine of impeccable appearance he possesses considerable capability but has been hampered from achieving his full potential due to his illness and involvement with outside interests (see attached addendum). He none the less has more than pulled his weight and has made significant contributions towards completion of the operational mission. His present illness has likewise disqualified him from participating in the PFT. As supervisor of a 10 man section he has capably led his men, and directed their efforts toward achievement of desired objectives. An articulate, well-read individual, he is adept at consolidating and drafting reports. Aware of the importance in broadening his education he recently completed an M.C.I. course in Blue Print Reading. Considering this Marine's relative standing among all those of the same grade I have known, I assign a grade of 3.

AR 1278-1279.

***<u>Mr. Lockwood's Top Secret Clearances</u>***

33. Mr. Lockwood received NAVSECGRU Top Secret clearance on July 8, 1970. AR 1377.

34. Mr. Lockwood received Top Secret clearance on October 16, 1970. AR 1376.

***Mr. Lockwood's Chronological Medical Reports***

35. Following his initial Medical Board, Mr. Lockwood's military medical records contain the following entries:

> "C/O hypesthesia developing over lat. rt. thigh & week ago -- no change since then. No specific muscular weakness. Long [box?] of LBP which has been progressively increasing on rt. side."

AR 816 (chronological medical record dated 9/2/1971).

> "31 y.o. w ♂ had onset 3-4 weeks ago of ® lat. thigh numbness. H/O some back pain chronic. Has arthritis under [illegible] by USN. PE: Back neg. No sciatic tenderness. Neurology legs neg. except ↓ [illegible] ® lat. cut. femoral n. distribution. No ant. [illegible] tinels. [Illegible]: Myralgia pasthitice. No Rx needed. Pt. told of etiology and possible cause [illegible] only if bazaar symptoms."

AR 817 (chronological medical record dated 9/21/1971).

> "Pt. came into sickbay & complaint of stuffiness and lose bowel movements, slightly feverish. Exam showed throat to be slightly inflamed. Temp 98.8° -- Dx [Koss vercal] syndrome. Rx [illegible] for fever. Force fluids, bed rest 24 hours."

AR 818 (Symptoms, Diagnosis, Treatment, treating organization dated 1/12/1972).

36. On June 1, 1972, while his discharge was being processed, Mr. Lockwood visited sickbay. The following entry was made in his medical chart:

> C/O falling asleep when talking, esp. in afternoon. Extreme fatigue, presently taking ASA gr xv qid. I hesitate to prescribe stimulants. Will ask Dr. Scott to see patient. [illegible signature]
>
> Sxs of anxiety and depression related to medical retirement from USMC after 13 years. Also his physically active life has been

> limited by his medical sxs. Heightened awareness of physiotropic
> sleep cycle. No meds. Will follow as OP or [illegible] basis.
> [illegible signature]

AR 176.

***<u>Mr. Lockwood's VA Benefit For Post Traumatic Stress Disorder</u>***

37. In January 2000, the Department of Veterans Affairs granted Mr. Lockwood a 30 percent disability rating for his claim for a service-connection with respect to Post Traumatic Stress Disorder. AR 518.

***<u>Mr. Lockwood's Application To The Board for Correction of Naval Records</u>***

38. On October 1, 1998, Mr. Lockwood submitted his Application For Correction and supporting documents to the Board for Correction of Naval Records. AR 145.

39. On October 11, 2000, The Board For Correction of Naval Records denied Lockwood's application. AR 111-114.

40. On November 16, 2001, Mr. Lockwood submitted his Motion To Reopen to the Board for Correction of Naval Records. AR 436-465 (motion papers), 466-550 (exhibits). Included in his Motion To Reopen were copies of the report of Dr. Ochberg (AR 326-336) and an affidavit by Lois Lockwood, dated June 23, 2000 (AR 124-130).

41. In either August or September 2005, Mr. Lockwood filed a second Motion To Reopen his application to the Board for Correction of Naval Records. Included with this second motion was another copy of the report of Dr. Ochberg, Lois Lockwood's affidavit, and affidavits from the following individuals:

Ward Boston, Jr., Captain (JAG Corps), U.S. Navy (ret.), dated January 8, 2004. AR 322-325.

James E. Ennes, Jr., CDR, U.S. Navy (ret.), dated April 21, 2005. AR 359-361.

Thomas Hartshorn, MGYSGT, U.S. Marine Corps (ret.), dated April 23, 2005. AR 368-369.

Stan White, MCPO, U.S. Navy (ret.), dated April 24, 2005. AR 362-365.

Richard Keipfer, Captain (Medical Corps), U.S. Navy (ret.), dated July 25, 2005. AR 348-358.

Tom Dixon, CCT, U.S. Navy (ret.), undated. AR 366-367.

42. Mr. Lockwood also included in his second Motion To Reopen: excerpts from Mr. Ennes' book, "Assault on the Liberty" (AR 278-280); a copy of an article by Richard K. Smith, "The Violation of the Liberty" (AR 268-277); and an article by Mr. Ennes addressing the attack on the Liberty (AR 282-283).

43. The BCNR denied Mr. Lockwood's application on April 11, 2006, in a Memorandum Opinion. AR 59-67. The BCNR concluded that Mr. Lockwood "ha[s] not demonstrated that [he] suffered from post traumatic stress disorder prior to [his] discharge." AR 59-60.

44. On July 27, 2006, Mr. Lockwood filed his complaint in this Court.

## PLAINTIFF'S FACTS[4]

45. At the time of his discharge from the military, GYSGT Lockwood was in fact then at least seventy (70%) percent disabled, suffering from undiagnosed, untreated Post Traumatic Stress Disorder, and numerous other disabling disabilities as a consequence of his service aboard the U.S.S. Liberty, AGTR 5, which disorder was grossly exacerbated by his subsequent tour of duty in Vietnam. [A.R. 55, 74, 99, 115, 253-267, 265-267, 316-336, 327, 331-335, 344, 358, 362, 469-478.]

46. In and prior to 1967, SGT Lockwood was a member of the Naval Security Group, assigned duties as a Russian Language translator. [ A.R. 322, 238.]

47. On June 8,1967, Lockwood was serving as a member of the Naval Security analysts conducting operations in their assigned stations below deck in the Communication spaces aboard the U.S.S. Liberty (AGTR 5). [ A.R. 147, 285.]

[4] PLAINTIFF'S STATEMENT REGARDING PLAINTIFF'S FACTS: Defendant declines to stipulate to these facts. In some instances defendant relates the cited record sources do not directly establish the asserted fact. Respectfully, we submit the stated fact is a fair summary of the record entries cited, or a fair inference therefrom. In other instances defendant asserts there are no contemporaneous records supporting plaintiff's version of the events. Respectfully, contemporaneous government and other records do exist supporting plaintiff's statements of the events, in the files of the White House, DOD, State, CIA, NSA, Navy, Army, Air Force, and, National Archives. These files establish 1) the planned willfulness of the Israeli attack; 2) that the Israeli forces knew this was U.S. Navy ship; 3) the intent of the attack was to sink the ship and kill the crew; 4) the U.S. government prepared and published a knowingly false report of the facts of the attack; 5) to conceal the falsity of the report, the Navy issued orders prohibiting the survivors from discussing the attack except as described in the false report and accompanying government press releases. The Board declined to act on plaintiff's motion to produce those records. Regarding plaintiff's witness statements, these are uncontradicted eye witness reports, and, with the exception of Mrs. Lockwood's statements, presented by men who have held very high security clearances issued by the government, attesting to thee credibility of these witnesses.

48. The USS Liberty was operating in International waters at least 12 miles off the coast of the Gaza strip. It was clearly identified as a U.S. Navy ship, both by the characteristics of its superstructure, its hull markings, and by the clearly displayed U.S. Flag. A.R. [AA.R. 271, 272; 362, 323.]

49. Units of the Israeli Air Force had monitored the ship for some 3 days as the ship proceeded through the Eastern Mediterranean, en route to its assigned station off the Gaza Strip. A.R. 147, 271-272, 281, 362.]

50. The USS Liberty was a so called "Communications Spy Ship," designed to "eaves drop" on communications in its assigned area [A.R. 270.].

51. The ongoing warfare between Israel and the then United Arab Republic was a matter of grave concern to both the United States and the Soviet Union, each of whom had treaty obligations with the opposing combatants. [A.R. 271.]

52. Of particular concern to both the US and the Soviets in June, 1967 was the belief that Israel had then developed nuclear weapons and would use those weapons if a threatened attack by the Iraqi Armored Corps was mounted against Israeli forces. [C.4.]

53. On information and belief the Soviet Union, in President to President communications warned the United States that if Israel launched a nuclear attack against United Arab forces, the Soviet Union would launch a retaliatory attack against Israel. [ C.4.]

54. On information and belief, President Johnson warned the Soviets that if such an

attack was launched against Israel, U.S. treaty obligations would require the U.S. to come to Israel's defense, and, the U.S. would retaliate directly against the Soviet Union; but, President Johnson committed to take all steps necessary to insure Israel did not launch such an attack. [ C.4.]

55. On information and belief, the true role of the Liberty was to monitor Israeli communications to insure Israel did not launch such an attack, and, to monitor United Arab force communications to insure that Soviet personnel were not actively engaged in the combat in support of United Arab activities. [C.4.]

56. On June 8, 1967, Lockwood was on duty in the ships communication spaces in a compartment below the water line. His duty station was also his battle station. [A.R. 147-149, 272, 285, 286-287, 350, 360, 363.]

57. At one point in the morning of the 8th, acknowledging the ship was operating in close proximity to a war zone, the C.O. ordered battle stations drills. [ A.R. 272.]

58. Shortly after the completion of that drill, without warning, the Liberty came under attack by units of the Israeli Air Force and the Israeli Navy, despite the fact the Liberty was clearly identified as a U.S. Naval vessel on the situation maps in the Israeli High Command Headquarters, despite the fact it was flying the U.S. Ensign, and, despite the unique characteristics of superstructure and multiple antennae clearly identified the ship as the U.S. Naval vessel, USS Liberty. [ A.R. 147,148, 272, 273, 280, 282, 283, 349, 362.]

59. Over an extended period of time, Israeli's planes repeatedly strafed the ship with armor piercing missiles, cannons and machine guns, targeting, in particular, the top side crew, the communication facilities, while the Israeli's jammed the radio channels used by the ship; another factor establishing that the Israeli's clearly knew this was a U.S. Navy ship, since the channels jammed were those used by the U.S. Navy. [A.R. 147,148, 273, 275, 278, 285, 359, 362-363.]

60. Ultimately, the ship was subjected to a coordinated attack by three Israeli torpedo boats, subjecting the ship to a barrage of machine gun fire, aimed at the signaling capacity of the ship, and intent on killing all remaining exposed crew members; then they launched 3 or more torpedoes. One of the torpedoes slammed into the starboard side of the ship, uniquely targeted to hit the ship's communication space; further evidence that the Israeli's well recognized the ship as a U.S. Navy Communications Spy Ship, and had specific knowledge of its design and where the critical communications monitoring capacity of the ship was located. [A.R. 147,148,273,275,285,359,362,363.]

61. Throughout these attacks, Lockwood and the other members of the Naval Security Group unit aboard the ship were at their assigned battle stations in the below deck communications spaces. [A.R. 147, 210, 273-275, 350, 359, 362-363, 1080.]

62. The torpedo hit directly into the communications spaces killing some 25 members of Lockwood's Naval Security Group unit. [A.R. 148, 210, 274, 282, 323, 350, 360,362-363]

63. The certificate of award for Lockwood's Silver Star, reports on Lockwood's unique heroism that day: "Staff Sergeant Lockwood, ..., was in the Research Operations space at

the time of the attack. After the torpedo attack Staff Sergeant LOCKWOOD, despite severe burns, the rapid rise of water, heavy smoke and complete darkness, was instrumental in the rescue of personnel from the flooded compartments, thus averting even further loss of life. Without regard for his personal safety or his injuries, he assisted in the rescue until ordered to leave. His calm, rational thinking and actions evidenced a high degree of professional competence and moral fibre. After the attack and again without regard for his own injuries and comfort, Staff Sergeant Lockwood spent long tedious hours in the care of the wounded and in whatever duties were required.. Staff Sergeant Lockwood's initiative and courageous actions were in keeping with the highest traditions of the United States Naval Service." [A.R. 210, 285, 1080, 1199.]

64. The factual basis of this award is testified to by the ship's Master Chief, Master Chief Stan White, in his declaration:

> "Among heroes, Gunner Lockwood was the outstanding example. This young Marine, with no previous combat experience, rose to the needs of all. As men began streaming out the hatch from the Comm Space, they were reporting that Gunner Lockwood was organizing the survivors and leading them out ... , making sure that the wounded were assisted to and up the ladder, and keeping the survivors in a disciplined, orderly maneuver. When the last of the walking wounded emerged from the space, Lockwood himself came up, helping a seriously wounded man get up the ladder. Everyone was reporting that it was living hell down there, with blood, seawater, broken pipes, mangled files and equipment, and, body parts all over the place. Lockwood's face was badly burned by the blast, and peppered with bits of gun powder and shrapnel from the explosion. I urged him to get medical attention for his burns, but he just turned and went back down the ladder.
> A few minutes latter, Lockwood was coming back out of the hatch, assisting still another wounded man from his unit. By now, Lockwood was covered with blood and seawater. Surprisingly, he went back down into the space. I learned latter that someone then

> dogged that hatch to maintain the water tight security of the vessel. When Lockwood came back up the ladder and found it secured, he raised bloody hell, finally getting the attention of personnel close to the hatch., who undogged it for him. Lockwood, after cursing out those who had dogged the hatch, told them to leave it open, that he had just dropped a wounded man trying to get the hatch open. He went back down, and returned with a shipmate on his back. The fellow was in a very dazed condition, and was sent to the medics immediately.
> Even then, Lockwood insisted on going back down into the space to be certain there were no living survivors down there. When he came back, he was very depressed, but reported that the crew still down there were all dead. Lockwood then began to apply himself, almost like a robot, to assisting in caring for the wounded. To me, it seemed he was in a daze, and that he had to keep going or feared he would lose control of himself." [A.R. 362-365, 287.]

65. Shockingly, no U.S. forces responded to the may-day messages of the Liberty. Navy units in the area began to respond, but were ordered to stand down by authorities in Washington. Ultimately, some 20 hours after the attack, Navy units arrived to treat the wounded, while the Liberty limped back to Malta. [ A.R. 148, 275, 278.]

66. The surviving crew were proud of their heroics; stupefied by and angered at Israel for the attack, at their government and the Navy for failing to come to their rescue; and, mournful for their dead shipmates who remained entombed in the Comm Space. The attack created a unique bond among the survivors. [A.R. 279, 348, 359, 362.]

67. As the wounded ship headed for Malta, they were joined by the vanguard of a Court of Inquiry appointed to investigate the attack on the Liberty. The Liberty crew felt the treachery and viciousness of the attack would be published for the world to see the treachery of the Israeli attack. Anyone looking at the ship would well recognize that this was a murderous

attack, intended to kill the crew and sink the ship. After battle shipyard examination of the Liberty established some 821 fist sized holes from missile and cannon shots, fragment damage too numerous to count, andm more than 1000 holes in the ship from machine gun hits, and, the tell tale burns from the napalm attacks! Yet, the crew would soon learn that revealing the truth of the attack was not the intent of the Court of Inquiry. [ A.R. 154-155, 276, 277, 279, 280, 281, 319, 320, 322-325.]

68. The President of the Court issued a Silencing Order threatening the crew members with courts martial and punitive action if they discussed the events on the Liberty with anyone, "not even your wives." Among those confirming the fact of this Silencing Order are included: the Legal Officer to the Court of Inquiry, CAPT Boston, JAG, USN, Retired, and, declarations of the following Liberty crew members: CAPT Keipfer, MC, USN, Retired, Cdr. Ennes, USN, Retired, MCPO White, USN, Retired, and former CTT I Harold Six[5], among others.[ A.R. 126, 166, 297, 324, 350, 359, 360, 364, 366, 368.]

69. The President of the Court declined to take the testimony of the majority of the crew, and, cut off witnesses when they attempted to discuss their efforts to communicate with the attacking Israeli force so as to insure the Israeli's recognized the Liberty as a U.S. Navy ship. Likewise, testimony concerning the efforts of the attackers to destroy the ship's lifeboats and life rafts were cutoff and excised from the record, as was testimony concerning the flags displayed by the ship, the violence and brutality of the attack, the obvious planning and coordination with

[5] Six's statement was made in his correction proceeding pending before the BCNR at the same time as Lockwood's.

which the attack was executed, and, the strength and duration of the attack. Finally, when the Liberty arrived in Malta, the crew was again ordered to refrain from discussing the events on the Liberty, under threat of courts martial, and , they were in effect quarantined by being assigned to a distant base, and denied the right to talk to the press. [A.R.280, 202, 154,322-325, 350, 360. ]

70. As time progressed, the crew began to recognize that their government did not want the true facts of this attack disclosed; and, that the Court of Inquiry was a sham, created to support the lies that the Israeli government was disseminating about the incident, describing it as a case of mistaken identity, short lived, and discontinued when the fact this was an American ship was discovered. The affect this betrayal by their government has had on the Liberty crew, in general, and Lockwood, in particular has been horrendous.[ A.R. 154, 202, 350, 360.]

71. Lockwood had received severe facial burning and shrapnel; but the real injury he suffered was psychiatric. As his anger at the false report issued by the Navy concerning the attack mounted, Lockwood became confused, angered, depressed, and, withdrawn. [A.R. 153- 162, 164-170, 353-357, 360, 361, 366, 367. ]

72. His wife describes how when he returned to Bremerhaven after the attack on the Liberty, he was "bitter and angry... that when asked what happened, he would get even angrier and then growl that he was forbidden to talk about it.....Yet, he would awake at night in cold sweat, screaming about dead people, floating bodies, about water drowning him." [A.R. 124-130, 126, 393-343.]

73. These nightmares well preceded Lockwood's post service fixation on his perceived

entitlement to the Medal of Honor. [A.R..474.]

74. Lockwood describes " I have frequent flashbacks of struggling to free Lentini and moving him to the ladder, of helping McFeggan[6] up the ladder, and then the horrible guilt and panic of dropping him back into the swirling darkness of gushing water, then diving back into the water to grab him again and wrestle him up the hatch and through the hatch. In those flashbacks and nightmares, I hear again the screams of the dying, the horrible sound of the explosion, and, the accompanying machine gun - rocket attacks on the ship; I again smell the smell of the dying, the blood, the vapors and smoke from the explosion, the smell of the burnt paint and metal, the odor and rush of the seawater mixed with the ship's fuel oil. I feel the shudder of the ship, the bumps from the floating equipment and the dead in the space, and, I sense again the panic of trying to exit that compartment for the third time, holding an injured colleague, only to find that someone dogged the hatch trapping us in the rising water.....In some respects, the flashbacks and nightmares are worse than the actual event." [ A.R. 147-162, 153-154, See also: 124-130. 329-330, 332.]

75. The Liberty's Medical Officer describes the space Lockwood was trapped in : " .... I had to go down into that space when the water level was down sufficiently......It is horrifying to recall that space. The water was the foulest smelling material you could imagine; a combination of blood, decaying flesh, the remnants of the explosion, and a maze of twisted metal, broken pipes and equipment. But the most horrifying of all were the mangled, mutilated bodies of our poor, dead sailors and marines. I shudder even thinking of it today. *** I can only imagine the incredible

[6] In fact it was Harold Six he dropped when the hatch was dogged.

trauma that sight must have been for GYSGT Lockwood. I well know the trauma it has caused me, which was not offset by medical training and experience. What is worse, he was down there while the dying were streaming blood and crying for assistance. He truly was placed in hell on earth." [ A.R. 348-358, 350-351.]

76. Other crew members testify to Lockwood's condition following the attack:

> i. Master Chief White: " Lockwood was a walking time bomb following his Liberty experience. It seemed obvious to me that he was holding his experience inside, and, that it would explode someday. Thus, he was a danger to himself and his unit." [A.R. 362-365, 364.]
>
> ii. Commander James Ennes, USN, Retired :( Cdr. Ennes, then Lt. Ennes, was one of the Liberty's officers, and a NAVSECGRU member) He relates how, after the attack, he was Lockwood's Division Officer at Bremerhaven and had daily contact with him:. Discussing events occurring well prior to Lockwood's alleged fixation on his perceived entitlement to the Medal of Honor, LCDR .Ennes states " In the course of the ..Court of Inquiry, the Navy issued a "Silencing Order" to all members of the Liberty Crew. We were cautioned under pain of sever discipline and punishment that we could not discuss the events of the Liberty attack with anyone, not our wives, our mothers, our families, no one. Every survivor of the Liberty crew that day that I have ever met describes how angering and frustrating that order was to them, individually, and, collectively. All of us of the crew had experienced a severely physically and emotionally stressful situation. Obviously, some had been subjected to more stress than others, especially those, like Lockwood, who were trapped in the Comm Space compartment when the torpedo struck........We would discuss how the attack was affecting us in our daily lives ..... Those discussions were highly emotional. The men , including Lockwood, would become highly agitated and tearful when discussing the attack, the Court of Inquiry, or, the Israeli and Johnson administration cover up......And, they expressed their anger at the silencing order, protesting that they couldn't tell their wives what had happened, ... so they could understand why they had changed so dramatically following that attack. I recall Lockwood ... describing ... experiencing

nightmares and difficulty sleeping. They, especially Lockwood and the other men who had been trapped in the compartment when the torpedo exploded, described waking up seeing the faces of buddy's blown away by the blast, feeling a sense of guilt for having survived the attack when so many of their shipmates had been killed, and, that they were afraid to try to get back to sleep after such nightmares in fear the dreams would come back.......While all the group expressed feelings of "survivor's guilt",...Lockwood seemed truly bothered by this. He would get especially emotional when these thoughts came over him....." [A.R. 359-361.]

iii. Tom Dixon, CTT I, USN, Retired (Not a Liberty Survivor) relating events well prior to Lockwood's alleged fixation on hs entitlement to the Medal of Honor, states : " When Lockwood and the others returned from the Liberty, they were all changed individuals. They were pretty badly shook up. Lockwood's face was burned from the flash fire caused by the torpedo explosion, and his face was pitted with fragments of gunpowder and tiny bits of shrapnel from the explosion ... All of the Liberty group were obviously "screwed up" by their experience. To a man they complained bitterly they were prohibited from speaking of the attack. .... It seemed to me that Lockwood was especially screwed up. He had the living hell scared out of him.....It seemed to me that he, and most of the Liberty vets had their brains screwed up. .... There were times he would lose his composure, and when he did, he became weird and dangerously close to losing it. There was one member of the NAVSECGRU ... teasing... and insisted that whatever the experience aboard the Liberty, medals granted were simply not earned until you have been on the ground and being shot at by enemies with guns in their hands. Whereas before the Liberty incident, Lockwood would respond and walk on, after the Liberty he would explode in a rage. I thought on many occasions Lockwood kill the guy if he had the chance. In retrospect, it was a telling change in character and demeanor for Lockwood." [A.R. 366-367.]

77. In March, 1969, Lockwood was transferred from Bremerhaven, ultimately to FMF III for duty in Vietnam with NAVSECGRU units. His unit was dispatched to a special operation, operation Oklahoma Hills. His Silver Star was presented to him in August, 1969 in a quite ceremony in Vietnam. His fellow Marines began dismissing the validity of the award, asserting it

had not been earned in true combat. He began feeling alienated from his unit leadership. [A.R. 147-162, 155-156, 124-128.]

78. Lockwood became troubled by the terrible death and maiming of seemingly innocent civilians, especially the old folks, women and children, he observed when engaged in "sweep and destroy"operations. Soon these visions became a part of his ever continuing nightmares and flash backs. [A.R. 156, ]

79. Lockwood began drinking more and more, but no longer would a few beers control the flashbacks and nightmares., or, help him get to sleep. [A.R. 156, 128, 178-179, 181, 188.]

80. Lockwood was further traumatized by his Vietnam experience, further feeding his deep seated anger, and stimulating his nightmares and flashbacks. He was being transported to a forward position when the helicopter he was on was shot down by enemy fire as it was landing at its destination. [A.R.155, 331] At another point in his Vietnam service, his unit was the target of a "sapper attack", with the satchel of explosives carried into their compound by a Vietnamese youngster not much older than his son.[ A.R. 155, 331] He was disturbed by the overt racism evident in the unit, which he felt was encouraged by the units officer and leading enlisted ratings. [A.R. 155-156] And, he was upset with the Marines for discouraging him from efforts to adopt and send home a Vietnamese orphan who hung out around Lockwood's unit.[ A.R. 34.]

81. While in Nam, he discussed his nightmares, flashbacks, and inability to sleep with one of the older ratings in his unit, and with others. To a man, the advice he received was to keep

that info from the medics. “Have a few beers and forget it,” was the advice received.[ A.R.156-157.]

82. When Lockwood returned home , he was a mess.[A.R. 157-158] His wife testified as follows: “ When Bryce came back from Vietnam, the kids and I were overjoyed. That joy was short lived. Bryce was a nervous wreck. He was drinking even more heavily than when he left. He was having even more trouble sleeping at night. He would wake up screaming and crying. He would mumble about floating bodies in the Comm space, or about mangled women and kids he had seen in Vietnam. ... He was impossible to deal with at home. His attitude towards the children, and especially towards our daughter, Dorothy, now 8 years old was so severe. His confrontational attitude towards John resumed. In addition, our personal and marital relationship was deteriorating. .... Before the Liberty attack .... we enjoyed a good, normal, active marital sexual relationship. When he returned from the Liberty, Bryce had great difficulty in regaining our sexual relations. ... it seemed things were improving when he was sent to Vietnam. .....When he returned from Vietnam, things were very difficult. Bryce’s sullen, angry, withdrawn attitude made it difficult to bring him back into the family..... His relationship with the kids became very strained. He became physical with our youngest son, then 6 years old.” [A.R. 124-130, 127-128.]

83. Lockwood began experiencing indistinct pain in his legs, back, and throughout his body, and his flashbacks to Liberty became increasingly disruptive.[ A.R. 128, 158, 816-817, 818, 2481.]

84. Ultimately, his superiors at NAVSECGRU, Homestead, Fla. directed him for

medical evaluation. His initial Medical Board, on June 30, 1971, established a diagnosis of Arthralgia, underlying etiology unknown, incurred in line of duty, determined this might be a permanent condition, and found him fit to return to duty. [A.R. 248.]

85. Lockwood waived his right to appeal the medical board findings and returned to duty. When his job performance further deteriorated, on April 14, 1972, he was processed to a physical evaluation board, found unfit because of physical disability with a diagnosis of Arthralgia, underlying etiology not determined at present, with a rating of 20%, and recommended for discharge.[ A.R. 171, 172,-173, 174, 175.]

86. On June 1, 1972, While his discharge was being processed he presented for medical attention, complaining of falling asleep when talking, especially in afternoon and of extreme fatigue; a diagnosis of Anxiety Reaction and Depressions was entered and no further action was taken. His discharge became effective June 30,1972. [ A.R. 176, 171.]

87. The years following his discharge were difficult. The nightmares, flashbacks, uncontrollable bouts of anger and rage, his drinking, his paranoia, all worsened. His family relationships further deteriorated. He could not hold a job, even jobs well below his education, skill, training and experience levels. He could not concentrate, mentally, and developed a lack of self confidence and self respect. When he found work, invariably, he shortly became argumentative, and then lost control of his anger, and was fired. [ A.R. 158, -162, 124-130, 129-130, 336, 254-255, 479, 484, 490, 500-501.]

88. He tried going into business for himself, was driven to personal bankruptcy. He

bought a small business, a feed and grain trucking firm. This failed. He tried selling insurance, but failed. [ A.R. 159, 160.]

89. He then found employment as an over the road tractor trailer operator, through the sympathy of a fellow Marine. Here, his record has been troublesome and unreliable, with frequent traffic citations, accidents, mixed deliveries, failure to maintain timely deliveries, and other difficulties. Ultimately, despite the protective strength of his union, the Teamsters, when his then most recent violation came on for grievance, the union business agent urged him to voluntarily retire since the employer would fire him if he did not, and, the union felt they could no longer protect him, given the long history of his problems. [A.R. 160.]

90. Since Lockwood came back from duty on the Liberty, Mrs. Lockwood had been urging Lockwood to seek help for his nightmare, flashbacks, anti-social behavior, inability to sleep, uncontrollable anger, and, his frequent crying bouts when the attack on the Liberty and the Report of the Court of Inquiry came into focus, which she felt was far too frequently. Usually this merely provoked an angry outburst, followed by sullen withdrawal. In or about 1994, she and Mr. Lockwood met a neighbor who was a medially retired NAVSECGRU officer having served at the NAVSECGRU at Karamasal, Turkey in 1960-61. Lockwood had served at Karamasal from 1964 through 1966. In or about 1996, the neighbor suggested Lockwood was suffering from undiagnosed Post Traumatic Stress, or some other mental illness and strongly endorsed the wisdom of seeking help, and suggested Lockwood do so promptly. Ultimately Lockwood did seek help.[ A. R 128-129.]

91. In or about April or May, 1997, on urging of his attorney, his wife, and his neighbor, Lockwood sought psychiatric evaluation at St. John's Medical Clinic in Springfield, MO, and had 3 or more consultations with John Greenhall, Jr., Psy.D., and his assistant-trainee. [A.R. 19-23, 24, 25, 504,918,920,925,926.]

92. In this same time period, VA doctors examined Lockwood and determined he was suffering from PTSD. [A.R. 479, 480, 481-487, 490-491, 492, 494, 495, 500, 505, 518, 563-564, 570, 574, 580., 594-595, 602-603.

93. In the fall of 1997, Lockwood consulted John M. Smothers, PhD, ABPP. Dr Smothers, following personal interviews with and evaluation of Lockwood, and neuropsychologic testing, determined Lockwood suffered from Post Traumatic Stress Disorder, created by his experiences aboard the Liberty ... and subsequent damage in Vietnam. [A.R. 178-191, 190-192.]

94. In October 1998 Lockwood submitted his Application For Correction and supporting documents to BCNR. [A.R. 145.]

95. A review of the "Administrative Record" as certified by the Navy Department demonstrates that the documents tendered by Mr. Lockwood in support of his application for correction , and in support of his requests for consideration or reopening have been maintained in a manner different from the manner in which they were presented by the applicant and have been so confabulated as to seriously deprive the applicant of a fair and responsible consideration of his application.

96. On October 11, 2000, The Board For Correction of Naval Records denied Lockwood's Application, relying on an advisory opinion from a LCDR Carroll, MC, USNR. Dr. Carroll rejected Lockwood's claims of PTSD, primarily on: 1) Lockwood's lack of interim medical treatment for the disorder or related depression or anxieties; and, 2) Lockwood's excessive concentration on his failure to receive the Medal of Honor. Dr. Carroll concluded that Lockwood's excessive concentration on the Medal of Honor contradicts the existence of key symptoms of PTSD as the cause of Lockwood's recurrent and intrusive recollections, and, rejected Lockwood's assertions of flashbacks and recurrent dreams as "self reported." Strangely, even while rejecting Lockwood's claims of PTSD, LCDR Carroll acknowledged that Lockwood's records in fact established the existence of key symptoms of PTSD arising from his military duties.[ A.R. 111-114.]

97. On August 28, 2001 Lockwood, accompanied by his wife, Lois Lockwood, underwent an extensive psychiatric interview and evaluation by Frank M. Ochberg, M.D. Dr. Ochberg conducted a thorough evaluation of Lockwood, interviewed Mrs. Lockwood ,and reviewed Lockwood's Marine Corps medical records, Marine Corps Personnel Record, his VA records to that date, his complete Application to BCNR (including Dr. Smother's report), and, the Board's Denial, including Dr. Carroll's advisory opinion. [A.R. 326-336.]

98. Dr. Ochberg is a well recognized psychiatrist, with special expertise in the diagnosis and treatment of Post Traumatic Stress Disorder. [A.R. 468,478,472, 474, 475. ]

99. Dr. Ochberg concluded : "It is clear that he had no PTSD before June, 1967 and

did ever after." [A.R. 331]Analyzing each of the diagnostic criteria established by the National Veterans Readjustment Survey, Dr. Ochberg found that Lockwood met criterion A (1) experiencing or witnessing traumatic event that involved actual or threatened death or serious injury [A.R. 331]; met criterion A (2), Threat induced fear, helplessness or horror [A.R. 332]; met criterion B (1) event causes recurrent, intrusive recollections, [A.R. 331]and, B (2) experiences recurrent distressing dreams of the event, and probably did in 1972 [A. R. 332-333] ; met criterion B (3) - acting or feeling as if the event were recurring [A.R. 333]- Dr. Ochberg determined Lockwood had flashbacks in 1967, but may have recovered from this symptom as of 2001, because these flashbacks now occur fewer than once a month [Id]; met criteria B (4) and (5), intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event, and psychologic reactivity on exposure to internal or external cues, and probably did in 1972 [A.R. 335]; met criterion C (1), avoidance of stimuli currently and in 1972 [A.R. 333-334]; met criterion C(2) in 1972 (Efforts to avoid activities, places or people that arouse recollections) but may have currently overcome this symptom; [A.R. 334] meets criterion C(3), and did in 1972 (inability to recall an important aspect of the trauma) [A.R. 334]; meets criterion C(4) and may have met it in 1972 ( markedly diminished interest or participation in significant activities) [A.R. 334]; meets criterion C(5) ( feeling of detachment or estrangement from others) and probably did in 1972 [A. R. 334] ; meets criterion C(6) (restricted range of affect) and probably did in 1972 [A.R. 334-335]; and, meets all of the criteria of D (1) through (6) and certainly qualified for more than two in 1972: Sleep difficulties; outbursts of anger; difficulty concentrating; hypervigilance; exaggerated startle stimuli [A.R. 335]. He concluded, "This constitutes a current and past diagnosis of PTSD."[A.R. 335]

100. Dr. Ochberg states that Dr. Carroll is mistaken in his findings that Lockwood's recurrent or intrusive recollections has been his own doing, "Rather than trying to forget about his experience.." Dr. Ochberg points out that in the 1967-72 time period, Lockwood was not engaged in activities that required him to remember the Liberty events.[A.R. 332] Dr Ochberg also states:"Dr. Carroll reaches an opposite conclusion based upon Mr. Lockwood's failure to report symptoms when on active duty, and upon his current preoccupation with injustice. Even if Dr. Carroll were correct about current PTSD, his arguments collapse when applied to PTSD in 1972. SSGT Lockwood was not preoccupied with fighting injustice back then. He had PTSD but told no one. There was no diagnosis called PTSD at the time. Denying shell shock and battle fatigue was expected of a Marine." [A. R 335.]

101. VA physicians, psychiatrists, psychologists, and other VA health care providers have consistently diagnosed Lockwood with PTSD, attributable to his Liberty and Vietnam experiences, since he applied for VA medical care and treatment in October, 1998.[ A.R. 479, 480, 481-487, 490-491, 492, 494, 495, 500, 505, 518, 563-564, 570, 574, 580., 594-595, 602-603.]

102. On or about September 10, 2001,[7] Mr. Lockwood forwarded a Motion To Reopen For Newly Discovered Evidence and Motion For Reconsideration with the BCNR. In his motion papers, Mr. Lockwood tendered as newly discovered evidence: Dr. Ochberg's Psychiatric Report dated August 28, 2001; 16 VA reports on Mr. Lockwood's health, bearing dates between

[7] Counsel tendered the document to UPS at the Staples Store in Oak Ridge, Tennessee, for delivery to BCNR. Counsel was then staying in Oak Ridge, caring for his brother then in the terminal stages of lung cancer.

August, 1999 and June, 2001, an affidavit from Mrs. Lois Lockwood, and, various other documents. [C.23.]

103. In a November, 2001 telephone conversation with Mr. Exnicios of the BCNR staff, counsel learned that the September filing had not been received at BCNR. It was explained that the mail to all DOD Washington area offices had been badly disrupted by the 9-11 attack on the Pentagon and the resultant increase in security measures, followed by the "anthrax" scare that disrupted all mail in the Capital area. It was mutually agreed a new Motion would be presented. [C.23.]

104. On or about December 1, 2001, new Motion papers, dated November 16, 2001, were filed. The previous filing was supplemented by additional VA reports bearing dates between August and October, 2001 [ A.R. 438, 465.]

105. By letter of Nov. 8, 2004, BCNR forwarded counsel a copy of Comments and Recommendations of the Director, Naval Council of Personnel Boards, dated July 26, 2004. The Director recommended a determination that Lockwood was not suffering from disabling PTSD at the time of his discharge in 1972. [A.R. 97-98.]

106. In or about August or September, 2005, counsel filed his Motion to Reopen. It contained additional copies of Dr. Ochberg's Report [A.R. 326], Mrs. Lockwood's affidavit, and, declarations from Lockwood's Liberty shipmates, CAPT Keipfer, MC USN, Retired [A.R 348], CDR Ennes. USN, Retired [A.R. 348], and, MCPO White, USN, Retired [A.R. 362] , declarations from former NAVSECGRU shipmates, CTT 1 Dixon, USN, Retired [A.R. 366], and

MGYSGT Hartshorn U.S.M.C., Retired [A.R. 368]; and, copies of statements made by RADM Staring, JAGC, USN, Retired [A.R. 319-320], and CAPT Boston, JAGC, USN, Retired, presented in another DOD proceeding. [A.R. 322-325.]

107. Dr. Keipfer's declaration addressed both his personal observations of Mr. Lockwood as a fellow shipmate, and his professional opinion that Mr. Lockwood suffered from PTSD, based on his observations of Lockwood 's condition on the day of the attack, in the ensuing days, and, based on his contacts with Mr. Lockwood in the intervening years, and his review of various medical journal articles dealing with the diagnosis and treatment of PTSD and battle related trauma. [A.R. 295-316, 317-319, 320,322-325.]

108. Dr. Keipfer, in his declaration specifically incorporated by reference various medical journals he relied on in establishing his professional opinion as to Mr. Lockwood's PTSD. Copies of those journals were included in his affidavit and included in the motion papers. However, without explanation, these have been separated from his declaration as filed in the certified administrative record.[ A.R. 370- 435.]

109. CAPT Keipfer, CDR Ennes, and, MCPO White attest to the Silencing Order and its chilling, frustrating impact on the crew.[A.R. 348, et seq.] CDR Ennes testifies to its specific impact on Lockwood.[A.R. 359, et seq.] CCT I Dixon [A.R. 366-367] and MGYSGT Hartshorn [A.R. 368-369] testify to their knowledge of the Silencing Order and its impact on Lockwood and the crew. Mrs. Lockwood testifies to how her husband could not explain to her what happened aboard the Liberty.[A.R. 544] And, CAPT Boston, confirms the fact the President of the Board,

and he as its counsel, issued the silencing order.[A.R. 322.]

110. Lockwood included in his initial application for correction, excerpts from CDR Ennes book, "Assault on the Liberty", [A.R. 278-280] describing the facts of that brutal attack, and a copy of an article by Richard K. Smith, The Violation of the Liberty,[A.R. 268-277] published in the June ,1978 edition of the U.S. Naval Institute Proceedings, and, excerpts from a later Ennes article addressing the attack on the Liberty, the U.S. Government cover up, and the multiple, frequently contradictory, "explanations" of the Israeli's. These are among the documents that have been confabulated throughout this administrative record. [A.R. 282-283.]

111. Offered to explain the background of the Silencing Order and its continuing grasp on the Liberty survivors, the BCNR has elected to totally ignore this evidence.[A.R. 40, et seq.]

112. On April 11, 2006 , the BCNR issued its Memorandum Opinion, denying the application for correction. [A.R. 59-67] The case contains still a new docket number. The Board found the evidence "was insufficient to the existence of probable material error or injustice .... It substantially concurred with the comments ... in the advisory opinion furnished by Dr. Carroll. ....concluded that .... you have not demonstrated that you suffered from post traumatic stress disorder prior to your discharge." [A.R.59-60.]

113. Ignoring the substantial, credible, relevant and competent evidence of record, BCNR asserted Mr. Lockwood "grossly exaggerated" his claimed disabilities; stating that his contention that he was "severely wounded in the Liberty attack is not supported by the available records." [A.R. 66.] The Board states: "your wife's memory of events which occurred at the

time is inaccurate," asserting that the record does not support the claim his face was severely burned. [A.R. 61.]

1. Lockwood has not contended his facial burns were severely disabling; merely that they constitute a compensable and ratable injury. [A.R.529.]

2. The Board's conclusions are a clear abuse of discretion, constituting an aggressively biased effort to support a preconceived determination, wholly inappropriate for this quasi judicial body.

114. In truth and fact, Mrs. Lockwood's statement was not focused on the age of her child, but the effect then SSGT. Lockwood's facial burns and impregnated residuals of the torpedo explosion, and the imbedded minute shards of shrapnel had on his then 3/12 year old child. and, in turn, the effect that had on SSGT Lockwood. We concede Mrs. Lockwood's statement erroneously referred to her daughter; it was in fact her son John who was the 3 ½ year child at the time. How utterly absurd that this Board, established to correct errors and injustices in the military records, would seek to base its determination on such irrelevancies.[ See: C., Attachment C, copies of a photo of Lockwood taken 9 June, 1967 showing Lockwood's face heavily impregnated with the flash burns and shrapnel.]

115. The Board's fixation on the issue of SSGT Lockwood's facial burns suggests it seeks to create a straw man and divert analysis from the issue of Lockwood's PTSD. The Board asserts ;

(i) " an x-ray conducted on 21 July, 1967 revealed no evidence of opaque

bodies...” . In fact, that report is unclear what it reports. It reads “ x-ray - no radio - opaque bodies in scalp or thighs ....“. [845.]

(ii) Contradicting the Board’s conclusion, the record contains substantial, credible , relevant evidence flatly contradicting the Board’s conclusion, including ;:1) Lockwood’s request for determination of his entitlement to the Purple Heart contains copies of his medical record from the USS America documenting those wounds, [A.R. 1422-1466 at 1424-1425] 2) the entry in the medical record dated January 10, 1968 reports “Pt ... now has scars and tattooing of face,” [A.R. 759] 3) an entry of January 16, 1968 by USAGH Landstuhl Plastic Surgery Service reports: “Pt has traumatic tattooing of face, very similar to black powder burns.” [C.,Attachment D, A.R.759]; 4) an entry of June 21,1967, [A.R.845, and 1228] and, 5) an entry of 14 August 1968. [A.R. 1011.] The record also contained, in addition to the pictures of Lockwood of 06-09-67, subsequent VA examinations and x-rays establishing the existence of facial scaring and minute shrapnel embedded in Lockwood’s face. [ A.R. 974,C. , Attachment E, , copies of photos taken by VA, 5-20-99.]

(iii) The Board’s finding that Mrs. Lockwood was “inaccurate” in her memory that the facial burns and scarring were clearly evident when SSGT Lockwood returned to Bremerhaven is not supported by the administrative record.

(iv) This “finding” seems to be an arbitrary and capricious , biased effort to

attack her credibility on the issues the Board does not address: her testimony as to Lockwood's nightmares, flashbacks, anger, changes in demeanor , etc.[A. R. 124-130.]

(v) The record facts clearly establish Lockwood's facial burns, including the record of his medical treatment aboard the U.S.S. America, [ A.R. 1424-1425] the statement of Dr. Keipfer relating his caution to SSGT Lockwood to avoid looking in a mirror, because of the then heavy black residue of the flash fire and explosion embedded in Lockwood's face [A.R. 350-351]; the statement of MCPO White regarding his efforts to get SSGT Lockwood to report for medical treatment for his evident facial injuries when Lockwood exited the hatch the first time with the first of the injured he rescued from the compartment; [A.R. 361] and, the statement of CTT 1 Dixon relating the appearance of the Liberty crew, including Lockwood, when they first returned to Bremerhaven following the attack on the Liberty.[A.R. 366.] Presumably, the Board did not view these as "credible."

iv) The COMNAVEUR Silver Star citation expressly notes the fact Lockwood had suffered "severe burns" but pursued his heroic rescue efforts in the flooded compartment.[A.R. 210] Presumably, the citation is not viewed as credible by BCNR!

116. In like manner the Board arbitrarily and capriciously focuses on irrelevant extra record material and reaches wholly unsupported speculation from that material in its attempt to

avoid addressing the Silencing Order and its effect on Lockwood's ability to make contemporaneous report of his PTSD while in service. The Board states that "Your contention ... "Silencing Order" ... allegedly prevented you from discussing the Liberty incident .... is belied by multiple entries in your service record ..., citing

1. "....shortly after the attack you submitted a personnel claim for reimbursement of the value of clothing and personnel {id} gear destroyed by "enemy action" ... when the ....Liberty ... was attacked by jet fire and torpedo boats ... off the coast of Israel." [A.R. 43.]
2. Tthis claim carefully followed the DOD approved discussion of the attack and did not identify the Israeli's as the attacking force, and did not discuss the willfulness of the attack. The Board knows, or should know, that in circumstances like the Liberty attack the submission of personnel claims for lost or damaged personal goods are commonly specifically encouraged and organized by the individual's command, and, the wording of such claims "recommended" by the Command. That certainly was the case with the NAVSECGRU members from the Liberty.
3. "You submitted an Administrative Action (AA) form .... in which you stated you had received wounds "aboard the USS Liberty ... and requested .... determination as to my eligibility for award of the Purple Heart." [A.R.43.]
4. This was action undertaken at the specific encouragement of Lockwood's

command, was necessitated by the Navy's delay in issuing said medals and awards out of concern that issuing such "combat" based awards would stimulate public focus on the attack, undo their "cover up", and disclose the falsity of the Court of Inquiry" Report, and, the request made no effort to identify the Israeli attacking force, or address the willfulness of the attack.

5. ".... your request for monetary compensation from Israel for your injuries. You claim to have received a small amount ... from Israel; however, according to .... Department of State publication, the average amount of compensation paid to survivors of the Liberty incident was about $20,000., which was a substantial sum of money in 1969." [A.R. 43]

6. The submission of this claim was specifically initiated, encouraged and approved by elements of the U.S. Government. The relevance of the amount paid, or whether it represented adequate compensation is wholly irrelevant to this proceeding. It is to be noted that in agreeing to make said payments, Israel continued to claim the attack was a short lived case of mistaken identity and to deny that the murderous attack on the Liberty was a carefully planned and deliberate attempt to sink the Liberty and kill its crew, with full knowledge that the U.S.S. Liberty was a U.S. Naval vessel, operating in the internationally recognized international waters. This well intentioned action by State did not serve the interests of the Liberty survivors. It can be argued it was more aimed at defending Israel from War

Crime Claims and personal injury claims by the Liberty crew. Its acceptance by State constituted still further endorsement by the U.S. Government of the known lies of Israel concerning the facts of this heinous war crime. It is, in any event, wholly irrelevant to the issues involved herein.

7. "You stated in your affidavit .... that while in ... Vietnam : I spoke to several people about my flash backs ...." [A.R. 43-44]

8. The Board seemingly does not understand how a frightened young man in the jungles of Vietnam would discuss with his fellow, but senior Gunner, or his unit corpsman, or his Company Officer, and, be guided by their caution that it was not prudent to discuss those issues with psychiatrists. As. Dr. Keipfer states in his declaration, referencing then medical journal articles on the mental health problems that arise from combat duty (based on studies commissioned by the Department of Defense and Department of Veterans Affairs), ''These article bring focus on the problems Lockwood faced, without assistance for dealing with his emerging PTSD following the attack on the Liberty. First, a fear of disclosure due to both peer pressure and to traditions of the Corps. Second, a lack of personnel trained in recognition of the problem and skilled in recognizing the need for intervention." [A.R. 352.] Lockwood had no concerns that his fellow Marines in the jungle would report his discussion. That fear arose when trying to deal with state side personnel.

117. The Board states :"There is no reliable indication .... that there was a significant decline in your previously high level of functioning following the .... attack on the USS Liberty." [A.R. 44.]

i) Noting Lockwood's "superior intelligence," it acknowledges that in the period immediately following the attack, Lockwood was rated as "excellent", and, "excellent to outstanding."[A.R. 41-42.] Contradicting the Board's conclusion, however, the Board then notes that from May 31, 1970 forward, Lockwood's "performance declined thereafter ... for the remainder of your career." [A.R.42.]

118. As the Board notes, Lockwood received multiple "fitness reports" from his superior officers from 1967 through the date of his discharge, including the following reports:

a.) 71-12-01- 72-06-30 (Homestead) "hampered from achieving full potential due to illness and outside interests." [A.R.1276-1279, 1277.]

b.) 16 July 71 - 30 Nov. 71 (Homestead) "above average...not inclined to offer his considerable talents toward achievement of Company ...objectives." "I have counseled this Staff NCO concerning this ... performance." [A.R. 1281-1283, 1282, 1283.]

c.) 12 Dec 70 - 15 July 71 (Homestead) "Above average ...Bottom of 5.."He has on occasion not given as much support to his seniors as I would like. .... has a lot of personal pride....I have counseled

...concerning his performance...[A.R.1284-85, 1285.]

d.) 1June 70 - 30 Nov 70 (Homestead) “Be Glad to have” Average marks in initiative and leadership..”has potential to become excellent to outstanding... not adjusted yet to properly supervising until completion.”[ A.R. 1287.]

e.) 20 Feb. 70 - 31May 70 (Homestead) Excellent “produces excellent results “ [A.R. 1288.]

g.) 23 Sept 69 - 31 Jan 70 (FMF III Vietnam) “Excellent... ‘thoroughgoing and conscientious... showed superlative judgement.” [A.R. 1292-1293.]

h.) 27 July 69 - 22 Sept. 69 (Nam) Excellent “...consistently and conscientiously moves in right direction.... extremely successful iin working with others...” [A.R. 1297-1298.]

i.) 2 May 69 - 13 July 69 (Nam) Excellent (Top5) “...well informed ... possessing keen sense of loyalty .... integrity of the highest order...” [A.R. 1301-1303.]

j.) 21 Jan. 69 - 1 May 69 (Nam) Above average (1 of 5) “...quick learner ... duties tedious... extra (Work) requirement cheerfully and willingly ... sound judgement .” [A.R. 1306-1308.]

k.) 15 Aug 68 - 15 Sept. 68 (TAD Rota Spain) Excellent “Excellent dedication ... impeccable bearing...outstanding representative...” [A.R. 1309-1310.]

l.) 1 Feb 68 - 31 July 68 (Bremerhaven) Excellent (1 of 13)"... strives for perfection ... one of most technically proficient ... growth potential outstanding ... [A.R. 1311-1313.]

m.) 20 Nov. 67 - 31 Jan. 68 (Bremerhaven) Excellent (1 of 15) " ... Without peer in his section ... predominant force because of his professional attitude ... ready volunteer... very dedicated to ... Corps ... Sailor/Marine of the month ... outstanding growth potential ... [A.R.1314-1316.]

n.) 1 Aug. 67 - 27 Nov. 67 (Bremerhaven) Excellent (1 of 17) " ... Unusually fine example of Marine ... striving for perfection ... growth potential to the highest enlisted ... ranks. ... the motivating force ... highly qualified ... [A.R. 1317-1319.]

o.) 1 Feb 67 - 31 July 1967 (Bremerhaven /USS Liberty[8]) Excellent (3 of 15) " ... mature thoughtful person ... capacity to handle ever increasing responsibilities ... His care for his family, and his concern for doing the honest decent thing in all his relationships makes him a real asset ... [A.R. 1321-1323.]

119. Contrary to the Board's assertion that Lockwood and his wife greatly exaggerate his injuries, these reports , based on close personal observations over a period of 13 years establish Lockwood to be a highly dedicated, morally conscientious, loyal Marine of the" highest integrity." [A.R. 1287,1292-1296, 1297-1298, 130-1303, 1304-1305, etc.]

---

8 There is no report of his service aboard the Liberty; this covers part of that period.

120. These reports also document Lockwood's progressive inability to maintain focus on his assigned duties, reflecting a progressive deterioration in his focus and performance from June 1970 forward. [A.R. 1287,1276-1279, 1283, 1285.]

121. This record also documents that notwithstanding the glow of these reports, the leadership of the Marine Corps detected Lockwood's growing difficulties in performance of his duties. Despite his excellent performance reports and his uniquely demonstrated judgement and presence oof mind as demonstrated by his actions aboard the Liberty and documented by his Silver Star award, the Marine Corps Selection Boards consistently passed Lockwood for selection for various prestigious programs premised on selection in a comparative evaluation selection process, including the Warrant Office Selection Boards,[ A.R. 1381, 1575- 1579, 1603-1608.] the Marine Associate Degree Completion Program, [A.R. 1397-1409, 1566-1574], and, appointment to Commission grade.[A.R. 1444]

122. In reaching its conclusion, the Board wholly ignores the fact that contemporaneous with this decline, GYSGT Lockwood was referred for medical evaluation, his resultant diagnosis of Arthralgia, unknown etiology, and, his subsequent medical discharge.[A.R. 172,173,175, 176, 238.]

123. The Board ignores, as apparently not "reliable", the declarations of CDR Ennes and CT I Dixon.

124. The Board, after unsupported disparaging comments regarding the quality of performance of the V A, [A.R. 44 ] asserts Lockwood's "alleged symptoms are not credible."

[A.R. 44-45] In support of its assertion, the Board references a report "of a licensed psychologist employed by a private mental health facility" that Lockwood consulted in 1997.[9] The Board does not identify the psychologist but infers Lockwood withheld this report from the Board. Presumably, the Board received that report from the VA, which agency requested and received authorization to obtain copies of records from Lockwood's private health care providers. Lockwood never received a copy of that report. Nothing in the Board's decision indicates that the Board has made any inquiry as to the psychologist's professional experience or competence in the diagnosis and treatment of PTSD; nor has the Board ever inquired as to the circumstances prompting Lockwood to discontinue that consultation, or, accorded Lockwood a personal hearing to evaluate his credibility.

125. The Board seeks to support its character attack on Lockwood, based on his reported employment by American Amicable Life Insurance ("AALI".) [A.R. 45-46.] Lockwood had been employed by AALI at various times during the years 1974 through 1984. The Board, without any record support whatsoever, concludes this was inappropriate for a person "allegedly

[9] The psychologist asserts in his progress note dated July 3, 1997 that he discovered a "missing piece" in the course of the interview that date, and assumed Lockwood understood the doctor would not support a diagnosis of PTSD, but did not so inform him. Strangely, although prescribing Paxil l a powerful anti-depressant, he made entries to the effect that Lockwood was an "unimpaired individual." The entry appears after he learned Lockwood was consulting another psychologist and was terminating their relationship. Those same "progress notes" show that in the subsequent consultation, dated July 16.1997, the psychologist steered the discussion to Lockwood's "sexual fantasy:, then asked, "where do we go from here." He then deflected Lockwood's concerns of the adverse effect of the prescribed medications on Lockwood's employment. Lockwood was becoming uneasy with the question of this man's competence. ( The doctor reported visiting his dead brother's grave, daily, and leaving quarter at the grave so the brother could call him if he needed.) Lockwood lost his employment due to an accident attributed to drowsiness induced by the medications. In turn, Lockwood lost his insurance coverage which was paying for the consultations.

suffering from PTSD, because persons with that disorder generally avoid stimuli associated with the precipitating trauma." [Id.]

1. It is unclear what relationship AALI has with either the Liberty attack or Lockwood's Vietnam service.
2. The Board refers to AALI as "one of the companies whose sales practices recently prompted Congress to the enact legislation [id] which restricts the on base sale of insurance to service members." It is difficult to perceive what relevance this "recent" legislation has to Lockwood's employment in the 1974- 1984 era.
3. Nothing in this record suggests that Mr. Lockwood engaged in any of the presumably inappropriate conduct that prompted the referenced legislation, or otherwise conducted himself in an in appropriate manner during his employment with AALI.
4. Had the Board inquired, Lockwood would have readily disclosed the facts of his sporadic relationship with AALI. His efforts were singularly unproductive; it seems that the Board may well be correct in its conclusion that this was an imprudent field of employment for him because of his PTSD.

126. The Board rejects Lockwood's claim that his PTSD should have been discovered and treated by Naval authorities, asserting his failure to disclose his symptoms constituted a waiver of his rights to disability ratings, asserting "Physicians and attorneys are not mind readers,

... " [A.R. 46]

i) We do not expect the Navy's doctors and lawyers to be mind readers. We respectfully submit that they have a professional duty equivalent to , if not superior to the professional duties of their civilian counterparts.

ii) The Navy had a statutory duty to provide Lockwood the medical care and treatment he required.

iii) Professionally prudent inquiry of Lockwood, and his family, as to symptoms he may have been experiencing was clearly indicated when this veteran of some 12 years service, with a history of 4 separate battle engagements presented with complaints of indistinct joint pains and muscle pains, not detectable on x-ray. He not only deserved, he was entitled to something more than a pro forma processing by the Navy's doctors and lawyers. As the Board itself notes, the results of x-rays, laboratory and clinical examinations were entirely normal. This man's record clearly established Lockwood was not a malingerer. Surely his command should have inquired as to what was going on in his work, his home, his life. Instead he was simply hung out.

127. The Board states there was no objective evidence in his medical record of any impairment of Lockwood's health or vigor. [ A.R. 65. ] It is evident that in reaching this conclusion, the Board equates "impairment" with x-ray observable physical injuries, and ignores the injuries of the mind. The Board's conclusions are contradicted by the Navy's action in

referring him to 2 medical boards, when his performance declined, [A. R. 172] and, its subsequent action determining Lockwood medically unfit. [A.R. 175] It is further contradicted by the medical entry establishing he was suffering from anxiety and depression while his Board action was pending; [A.R. 176] by the consistent actions of the Corps in passing Lockwood over for the various special advancement programs he sought throughout his career, and, by the marked decline in his fitness reports on is return from duty in Vietnam.

128. The Board next seeks to glorify the action of the doctors and physician involved in his PEB and discharge. It asserts that there actions resulted in his receiving a $15,000.00 lump sum payment when "Had you been found fit for duty by a hearing panel, you would have faced the possibility of being discharged administratively without entitlement to any monetary benefits from the Marine Corps." [A.R. 47.]

i) The lump sum payment represented less than 4 years of benefits he would have received on the TDRL, without consideration of the value of the medical benefits he and his family would have qualified for had proper inquiry been made. Indeed, his benefits from achieving medical retirement would have by now exceeded $100,000.00, without consideration of intervening increases in base pay, or the value of his and his family's medical and commissary benefits.

129. The Board attacks Lockwood for pursuing his claims before the VA, asserting such are grossly exaggerated., proclaiming its judgement that "you have actively sought benefits from the VA that have no apparent relationship to your military service , or are not disabling, such

as a back condition, neck injury, hearing loss, irritable bowel syndrome, rhinitis, shoulder injury, and, residuals of a concussion."[A.R. 47] It then seeks to support its findings on the premise of the "presumption of regularity" that attaches to official records, all the while disparaging the records of the Veterans Administration records, and the findings f the PEB.

130. In contrast to the speculative opinions of the Board's advisors relied on by the Board, the VA records are based on extensive personal testing and evaluation of Mr. Lockwood by the VA officials presenting those reports.[See, A.R. 639-645, 646-653, 654-656657-674, 675-679, 680-682.]

131. One wonders what record the Board reviewed. This a veteran who was in a compartment, below decks, when a torpedo exploded into the compartment some 10 feet from him. It is surely not surprising that he thereafter has developed hearing loss and Tinnitus, or that he suffers residuals of a concussion.

132. Lockwood pulled three men from under the debris of that compartment as it rapidly flooded, descending four times into that flooded compartment to be certain all survivors had been rescued He carried at least one of the severely wounded up that ladder twice!. It is not improbable that he attributes subsequently established damage to his back and neck as arising incident to that heroic activity.

133. We do not question that intervening events likely exacerbated that damage, but it is undeniable these events have clear relationship to his military service, and have a high probability of causing damage to his back and neck.

134. The flooded compartment would hardly pass a Health Department test for clinical conditions. Dr. Keipfer 's declaration testifies to the horrendous nature of the contents of that compartment. That exposure to such would cause significant disruption of the digestive track; that Lockwood's flashbacks and nightmares would exacerbate his irritable bowel syndrome; and, that the medications he has been prescribed for his service incurred disabilities further aggravate that condition are predictable consequences of these facts.

135. The Board asserts the fact that Lockwood was granted Top Secret clearance in 1970 "militates against a determination that you suffered from significant psychological pathology prior to that time , or used alcohol in a dysfunctional manner." And, "Your superiors apparently did not have any reason to believe that you suffered from a mental disorder, or abused alcohol, because if they, they would have suspended or terminated your access to classified defense information, and you certainly would not received a final top secret clearance."[id] We mean no disrespect to these "superiors" or to the ONI, there is simply no basis for such self congratulations. The failures of the ONI and the Navy in both its conduct of background investigations and issuance of security clearances, and, its handling of classified security information and data in the 1970 era is well documented in multiple court proceedings not of record herein.

136. The Navy lost its moral compass in dealing with the attack on the Liberty; first the false Report of the Court of Inquiry; then it has stood mute in the intervening years as Israel and its spokespersons in the U.S. have attempted to destroy the character and reputation of those who attempted to set the record straight. Now we witness the Board's character assassination of

former GYSGT Lockwood and his wife. This simply demonstrates that it remains frozen to that tragic mistake and has yet to chart an appropriate course to correct that miscarriage of justice, and provide relief to the Liberty survivors struggling with the sense of rejection and denial by their government.

137. At no time did the Navy provide Lockwood or his family any precautionary guidance concerning the probable consequences of the trauma he had experienced both aboard the Liberty and in Vietnam; or of the probable consequences of his resultant alcohol abuse. To the contrary, the Navy maintained a concerted and continuing effort to preserve and protect the false report of the Liberty incident from disclosure, thereby labeling the men of the Liberty as liars seeking unwarranted attention and personal advantage in their efforts to disclose the truth of the attack; and, the Navy tolerated, even encouraged, a culture of social life that was heavily alcohol centered and provided ample supplies of alcohol at subsidized prices in its Navy Exchange Package Stores on the Naval bases to support that culture.

138. The Navy well knew that individuals suffering from stress related and other psychiatric disorders commonly also experienced substance abuse disorders, but, notwithstanding its statutory duty owed Lockwood and all naval personnel to provided the necessary medical care and treatment, made no effort to monitor the post trauma health of those it exposed to such risks.

139. The Board here adopts the opinion of LCDR Carroll. In doing so, the Board wholly fails:

i) to provide analysis of whether Dr. Carroll's training and experience

qualified him to express that opinion, or why Dr. Carroll's opinion was not reviewed by or approved by his superiors in the Navy's Mental Health Care program.

ii) to examine whether current DOD studies support Dr. Carroll's theory that Lockwood's fixation on his entitlement to a Congressional of Medal of Honor is not characteristic of PTSD because allegedly Lockwood's diminished recurrent and intrusive recollections and his diminished interest in other activities, are the result of that fixation, not the result of his trauma;

iii) to discuss MAJ Stetson's contrary opinion, and opinion reviewed and approved by the head of the National Naval Medical Center Behavioral Health Clinic.;

iv) to discuss the Director, Naval Council of Personnel Board's conclusion that "the available records .... nonetheless present a compelling picture of ... longstanding lingering symptoms suggestive of Post Traumatic Stress Disorder likely having their onset while Petitioner was on active duty and significant worsening subsequent to his medical discharge in 1972. "

v) to discuss the Report of Lockwood's psychiatric condition by Dr. Ochberg, or, the declaration of Dr. Keipfer, including his opinion as to Lockwood's condition and its origin.

vi) to discuss and analyze the medical journals incorporated by reference by Dr. Keipfer in formulating his opinion, and expressly incorporated in Dr.

Keipfer's statement, and the relevance of those reports to Dr. Carroll's and the Board's findings and conclusions.

vii) To conceal the factual signifcance of these medical journal articles, Defendant separated them in the Administrative record from Dr. Kiepfer's declaration and identified them merely as reference materials submitted with Mr. Lockwood's BCNR petition, rather than acknowledging them to be professional medical journals relied on the doctor in reaching the opinions and determinations established in his testimony, and specifically incorporated into that testimony by specific reference. [A.R. 348-358, 370-369.]

140. Instead of a responsible analysis of the facts and pertinent medical criteria, examined in the light of best currently available medical research on the subject, the Board in a capricious abuse of discretion and in disregard of substantial relevant and competent evidence, chose to rely on a dated opinion of a junior medical officer that was not endorsed or approved by that fficer's medical supervisors, based on only a portion of the record, without determining if the author of that opinion would continue of that opinion in the light of current medical research and the additional facts of record.

141. The Navy possessed substantial relevant, competent, credible evidence: regarding: the multiple trauma Lockwood had been exposed to in the attack on the Liberty; [ A.R. 322-325, 337-343, 359-362, 362-365,280, 273- 277, 203-205] the horrible continuing trauma it was inflicting on Lockwood and the other Liberty survivors by publication and defense of its

knowingly false report of that attack; [A.R. 370-435] that the Government of Israel and its spokespersons were asserting that the Liberty survivors were lying regarding their representations concerning that attack; that such attacks on the credibility and integrity of the Liberty survivors were designed and intended to silence the statements of the crew [203-205], and, would exacerbate the psychologic and psychiatric injuries inflicted on those men incident to that attack; and, that the trauma experienced aboard the Liberty, especially by those, including Lockwood, who were trapped in the flooded compartment, would most likely induce flashbacks, nightmares, uncontrollable rages of anger, alcohol and substance abuse, family abuse, social and family withdrawal, loss of interest, diminished ability to focus, and multiple other symptoms. [A.R. 468, et seq., 348, e seq., 370-435]

142. The Navy owed a duty to Lockwood and his fellow Liberty survivors to inform them and their families of these likely dangers; [A.R. 370-435] to establish a culture encouraging Lockwood and the crew to recognize and disclose such symptoms as they occurred and to seek appropriate treatment; [A.R. 370- 374, 375-390, 391-394, 395-398, 3990410, 411-414, 416-418, 419-430, 431, 432, 433435], - to provide him counseling, guidance and treatment, and, to make timely and effective inquiry and investigation to identify those crew members suffering from such symptoms. [ A.R. 375- 390 at 379-382] Most certainly had the Navy feared the crew had been exposed to some communicable "physical" disease, it would have embarked on an aggressive and intrusive program to identify and treat those exposed.

143. To protect the Government of Israel from the loss of respect of the American public if the truth of the attack were published, the Navy elected to ignore its duty to the crew,

imposing a Silencing Order on the crew, prohibiting them from discussing the event, otherwise than as stated in the falsified report and related press releases. [A.R. 280. ] By so doing, the Navy wholly failed in performance of its duties owed Lockwood, depriving him of the ability and opportunity to understand these symptoms for what they were. Instead, it opted to preserve the culture of the Corps rejecting such symptoms as signs of personal weakness, thereby condemning Lockwood and his family to a troubled, dysfunctional life, without relief.

**<u>DEFENDANT'S FACTS</u>**

144. Mr. Lockwood stated in his BCNR application:

> I spoke to several people about my flashbacks. Frankly, I never let on that the NAM duty was becoming a part of them. I merely described the Liberty part. Among those I talked to was an older Gunnery Sergeant I felt comfortable (safe) with, one of our company corpsman, and, a few fellow Marines. Everyone said the flashbacks were common among vets. They implied that it was understandable I was having them because this was my first "real combat" experience. Their advice was: "Have a few more beers; you'll get over it in time." Everyone said I'd be nuts to talk to any medic or officer about it. That would end my Marine career. I was fixed on my intent to be a career Marine. Thus, except for these few discussions, I kept this to myself and kept drinking more and more.

AR 156-57.

145. In 1995, Mr. Lockwood filled visited a medical facility and filled out a patient information sheet where he indicated that he had no current medical problems. AR 19.

146. On June 19, 1997, Mr. Lockwood was referred to St. John's Medical Clinic by his treating psychiatrist, Dr. James Neal, "for Post Traumatic Stress Disorder." AR 21-23, 920.

147. At St. John's, Mr. Lockwood was placed under the care of John D. Greenhall, Psy. D. AR 920.

148. Dr. Greenhall made notes of his sessions with Mr. Lockwood on June 19, 1997 (AR 920), June 25, 1997 (AR 918), July 3, 1997 (AR 24), July 16, 1997 (AR 926), July 30, 1997 (AR 25), and September 18, 1997 (AR 925).

149. Mr. Lockwood discussed his experiences aboard the U.S.S. Liberty and the guilt he felt about the attack during his first two sessions with Dr. Greenhall. AR 920, 918.

150. Dr. Greenhall's notes from the July 3, 1997 session with Mr. Lockwood state, in part:

> Resumed conversation of last week until Tx finally explained to Bryce that Tx had feeling there was a piece of the puzzle missing. Indeed, Tx had intuited same for a while and, despite probings, left with feeling of confusion. Bryce finally allowed the other "piece" i.e., he was currently seeking disability coverage at the recommendation of his attorney. Bryce states that he does not suffer the typical PTSD symptoms of reliving the incident although memories remain vivid in his mind. Instead, he relates having a feelign of extreme fear when performing a non-related work task approximately one year ago, the genesis of which he had absolutely no idea and did not appear to emanate from the shipboard incident. Tx, at this time, had no solid feelings regarding the "incident" and the application for disability but he and Bryce agreed they would explore that relationship at our next session.

AR 24.

151. Dr. Greenhall's notes from the July 30, 1997 session with Mr. Lockwood state, in part:

> Bryce also elated he has a meeting on the 16th with his attorney and a couple of other professionals, including a psychologist, to discuss his pending request for disability. Tx did not comment on this since Tx is fairly certain Bryce is aware he does not meet the criteria for Post Traumatic Stress Disorder and Tx would have to testify to same. As seemingly an afterthought towards the end of the session, Bryce commented on his last assignment and stated he hadn't had time to consider same. Indeed, Bryce seemed to be having difficulty saying good-bye and commented he would call for his next appointment although he'd always made his appointment prior to departure. Tx is comfortable if Bryce chooses to self-discharge since there appears to be no diagnosis at this time.

AR 25

152. On December 1, 1997, Dr. John Smothers, Ph.D., a Diplomate in Clinical Psychology at Medical Quality Management Co., located in Bethesda, Maryland, sent a letter to William Kenney, Mr. Lockwood's attorney, that stated in pertinent part:

> Dear Mr. Kenney . . . Thank you for asking me to evaluate Mr. Lockwood. (AR 178) *** My purpose in this evaluation is to learn whether Mr. Lockwood shows signs and symptoms associated with post traumatic stress disorder to help in clarifying his concerns. (AR 179) *** When I attempted a standard psychiatric interview with Mr. Lockwood, I found it hard to do so. When I asked about possible difficulties, he referred instead, directly and indirectly, to his experience aboard the Liberty. So I asked him about these experiences and he described them in detail. (AR 187) *** I believe that the client's history and his way of responding to evaluation techniques show that he meets diagnostic criteria for Post Traumatic Stress Disorder (DSM-IV 309.81). (AR 190)

153. On August 28, 2001, Dr. Frank M. Ochberg, M.D., interviewed Mr. Lockwood and his wife for four and a half hours, reviewed Mr. Lockwood's application to the Board For Correction of Naval Records, and produced a report that appears at AR 326-336. The report states, in pertinent part:

> This constitutes a current and past diagnosis of PTSD. In my professional opinion, there is no doubt of the presence of PTSD now, confirmed by VA examination. Dr. Carroll [10] reaches an opposite conclusion based upon Mr. Lockwood's failure to report symptoms when on active duty, and upon his current preoccupation with injustice. Even if Dr. Carroll were correct about current PTSD, his arguments collapse when applied to PTSD in 1972. Ssgt. Lockwood was not preoccupied with fighting perceived injustices back then. He had PTSD symptoms, but told no one. There was no diagnosis called PTSD at the time. Denying shell shock and battle fatigue was expected from a Marine. We now have PTSD diagnosis and experts trained in making the diagnosis. Congress appropriated $11,000,000 to study the incidence of PTSD in Vietnam era veterans, including retroactive diagnosis. 24 "experts" were selected and trained to accomplish this task. Mr. Lockwood would be diagnosed as having PTSD during Vietnam service by any of us serving on that study. *** It would help his sense of justice and his course of recovery if his government corrected his military medical record.

AR 335-336.

154. On November 8, 2004, the Director, Naval Council of Personnel Boards, submitted his comments upon Mr. Lockwood's 2001 BCNR application. Those comments are:

> a. The petitioner, a decorated combat veteran, is requesting a retrospective modification of his 1972 medical discharge adding the diagnosis of Post Traumatic Stress Disorder resulting from his experiences aboard the USS Liberty on 7 June 1967, and aggravated by service in Vietnam from 1968 to 1970 rendering him "permanently disabled" at a rating of 70% and Placement on the Permanent Disability Retirement List.
> b. The available records including evaluations by psychologists, while not in total agreement, nonetheless present a compelling picture of inspiring service to country, inadequately recognized heroism, and longstanding lingering symptoms suggestive of Post Traumatic Stress Disorder likely having their onset while Petitioner was on Active Duty and significantly worsening subsequent to his medical discharge in 1972.

[10] Dr. Carroll is the Navy doctor who opined on Mr. Lockwood's original BCNR application and recommended denial of Mr. Lockwood's claim.

> c. However, Gunnery Sergeant Lockwood's Fitness Report record and subsequent record, also, suggest that the same fortitude and tenacity which allowed him to pursue his elsewhere documented considerable acts of heroism would appear to have enabled him to complete circa thirteen years of active service with a recommendation for promotion as well as hold down a job for about two years subsequent to his discharge.
>
> d. The determinations of the uniformed services Disability Evaluation System (thru its Physical Evaluation Boards) are performance based, requiring credible evidence that a given condition renders a member unfit for duty while on active duty in contrast to the Veterans Affairs' disability evaluation process, which is, largely, manifestation based, requiring only that a given condition has service connection.
>
> e. Consequently, sadly, while the evidence for service connection (for VA purposes) is compelling, there is insufficient evidence that the Petitioner's Post Traumatic Stress Disorder rendered him unfit during the time that he served on active duty.

AR 97-98.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ Bryant G. Snee
BRYANT G. SNEE
Deputy Director

/s/ Devin A. Wolak
DEVIN A. WOLAK
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., N.W.
Attn: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel. (202) 616-0170
Fax. (202) 514-8624

Attorneys for Defendant

/s/ William J. Kenney
WILLIAM J. KENNEY, Esq.
HART/HTC
600 Pennsylvania Avenue, S.E.
Suite 105
Washington, D.C. 20003
Tel. (202) 547-5129
Fax. (202) 547-8311

Attorney for the Plaintiff

June 22, 2007

**CERTIFICATE OF FILING**

I hereby certify that on June 22, 2007, a copy of the foregoing "Join Statement of Facts and Issue" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Devin A. Wolak
DEVIN A. WOLAK