**IN THE**

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **Bryce F. Lockwood** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Docket No. 06- cv-00543** |
| | ) | |
| **v.** | ) | **(Judge Horn)** |
| | ) | |
| **The United States,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFF'S ANSWER IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

William J. Kenney
D.C. Bar No. 99267

Attorney for the plaintiff
Bryce F. Lockwood

%HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202 -547 - 5129
Fax: 202 -547 – 8311

9915 Empire Woods Court
Charlotte, NC 28277
Tel/Fax: 704-341-4781

July 3, 2007

# Table of Contents

Plaintiff's Answer in Opposition ........ 6

Supplemental Statement of Issues ........ 7

Counter Statement of Case ........ 7

Nature of Case ........ 7

Argument ........ 16

Jurisdiction ........ 16

Standard of Review ........ 16

Plaintiff's Claim Not Barred by 72 PEB ........ 16

Limitations Statute Equitably Tolled ........ **17**

Board Waived Discretionary Limitations Policy ........ **19**

Conclusion, ........ **19**

# Table of Authorities

## Cases

*Arbaugh v. YTT Corp., 126 U.S. 1235 (2006))* ............ 15

*Bailey v. West (Principi), 160 F. 3d 1369 (1998)* ............ 16

*Chambers v. U.S., 417 F. 3d 1218, 124 (Fed. Cir. 2005),* ............ 13

*Contrell v. U.S., 42 Fed. Cl. 144, 154 (1998);* ............ 14

*Diazlo v. U.S, 230 Ct. Cl. 506 (1982). ………….* *.15*

*Entendencia v. U.S., Fed Cls Docket 06-5150, Fed. Cls. ,decided 03-19-2007.* ............ 16

*Fisher v. U.S., 402 F. 3d. 1167, 1173 (Fed. Cir. 2005) (En banc.)* ............ 12

*Furlong v. U.S. , 152 Ct. Cl. 238, 240-241 (Ct. Cl. 1957)* *15*

*Glover v. U.S., 88 U.S. 342 (1874)* *15*

*Harper v. U.S., 310 f./ 2D 405. 159 Ct. Cl. 135 (1962)* ............ 13

*Henke v. U.S., 60 F.3d 795, 797 (Fed. Cir. 1995)* ............ 12

*Japenese War Notes Claimants Ass'n. v. U.S., 373 f. 2D 356, 358-359 (1967), cert. denied, 389 U.S. 971(1971).* ............ 14

*Jaqauy v. Principi, 304 F. 3d 1276 (Fed. Cir. 2002) ( en banc.)* ............ 16

*Leonars v. Grober, 223 F. 3d 1374 (Fed Cir. 2000)* ............ 16

*Proper v. U.S., 154 f. Supp. 317, 138 Ct. Cl. 511 (1957)* *15*

*Real v. U.S., 906 F.2d 1557,1560 (Fed. Cir. 1990)* ............ 13

*Scarborough v. Principi, 541 U.S. 401, 414 (2004)* *15*

*Urie v. Thompson, 367 U.S. 163, 169-170 (1949)* ............ 14

*Young v. U. S. 535 U.S. 43 (2006 )* ............ 15

## Statutes

10 U.S.C. 1201 (2000) 12, 15

28 U.S.C. 1491 (2000) 12

28 U.S.C. 2501 (2000) 11

Other Authorities

DSM 13

**IN THE**
**United States Court of Federal Claims**

| | | |
|---|---|---|
| **Bryce F. Lockwood,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Docket No. 06- cv-00543** |
| | ) | |
| **v.** | ) | **(Judge Horn)** |
| | ) | |
| **The United States,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## PLAINTIFF'S ANSWER IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff here responds in opposition to defendant's motion to dismiss. Defendant asserts the Court lacks "subject matter jurisdiction," asserting the claim is barred by the statute of limitations. Plaintiff respectfully submits defendant's motion must be denied. Defendant's fraud and misconduct equitably estop defendant's invocation of the asserted statute of limitations, equitably tolling said statute. In any event, the motion is at best premature in that disputed questions of fact exist regarding defendant's fraud, misrepresentation and misconduct that precluded plaintiff from timely presentation of his claim. Specifically, these unresolved disputed issues of fact include defendant's issuance of the knowingly false report of the Court of Naval Inquiry regarding Israel's attack on the USS Liberty (AGTR-5); it's issuance of silencing orders to conceal the falsity of said report; defendant's false and erroneous representation that plaintiff's symptoms of

depression and anxiety were situational reactions to his pending discharge, when in fact defendant knew or should have known these were in fact symptoms of his disablement from PTSD, and, defendant's misconduct in attempting to close the Correction Board case and conceal the advisory opinion from the BuMed consultant supporting plaintiff's claims his PTSD was incurred in and disabling at the time of his discharge.

## SUPPLEMENTAL STATEMENT OF ISSUE PRESENTED

Whether the Court lacks jurisdiction to entertain Lockwood's claim as barred by the Statute of limitations where the claim was presented within six years from defendant's denial of his application for correction of his Marine Corps records on his claim he should properly have been placed on the Retired List by reason of his disabling PTSD and other medical disabilities existing but undiagnosed at the time of his discharge.

## COUNTER STATEMENT OF CASE

### Nature of The Case

Plaintiff Bryce Lockwood is a former United States Marine Corps Gunnery Sergeant who was medically discharged following 13years, 3 months active duty from April 1, 1959 through June 30, 1972. AR 171. Throughout his Marine Corps career he earned multiple medals and awards for his service aboard the U.S.S. Liberty (AGTR-5) and his subsequent combat service in Vietnam. AR 171,238,210[1]

On and prior to June 8, 1967, the Liberty, a U.S. Navy "communications Spy Ship" was performing its assigned duties, operating in international waters at least 12 miles off the coast of the Gaza Strip, monitoring communications of Israeli and United

[1] AR refers to the Administrative Record.

Arab Republic forces then in active state of war. AR 270, 271,272,362, 323. Units of the Israeli Air Force had monitored the Liberty for some 3 days as it progressed through the Eastern Mediterranean and took up its station off the Gaza strip, and, its status as a US. Navy Ship was clearly identified on the "'Situation Board[2]" maintained by the Israeli Defense Command. AR 147,271-272,282,362. The U.S was not a party to that war. The Liberty was clearly identified as a U.S. Navy ship, both by the unique characteristics of its superstructure and its numerous antennae, its hull markings, and, by the clearly displayed U.S. Flag. Id.

On June 8, 1967, then SGT Lockwood was a member of the Naval Security Group stationed aboard the U.S.S. Liberty (AGTR-5), at his duty station and battle station in the below deck communications compartment of the ship[3]. A.R. 147-149, 171,238, 272, 285, 286-287, 350, 360, 363. Without warning the Liberty came under attack by units of the Israeli Air Force and the Israeli Navy. These multiple, carefully planned and coordinated attacks continued over an extended period of time of ninety minutes or more, repeatedly subjecting the ship to strafing with armor piercing missiles, cannons, and machine guns, targeting, in particular, the communications facilities, the top side crew, and, the ship life rafts and boats. Throughout these attacks the Israeli's jammed the radio channels used by the ship, channels characteristically used by the U.S. Navy. Ultimately, some 40 minutes into the attack, the ship was subjected to a

---

[2] The "situation board" locates and identifies various units of Israeli and UAR forces and other items of interest or concern to the Israeli military commanders.

[3] The Navy refers to their duties as "communication research."

coordinated attack by three Israeli torpedo boats, subjecting the Liberty to a barrage of machine gun fire aimed at the signaling capacity of the ship, and intent on killing all surviving exposed crew members; then they launched 3 or more torpedoes. One slammed into the starboard side of the ship, uniquely targeted to hit the ships communication space, further evidencing the fact that the attackers well recognized this vessel was the U.S. Navy Communications Spy Ship. AR, Id. 359, 362-363

Throughout these attacks, Lockwood and other members of the Naval Security Group continued performing their assigned duties in the below deck Communications Department. The torpedo hit directly into the Communications space. Lockwood's Silver Star Citation relates some of the facts of his unique heroism that day: "Lockwood, despite severe burns, the rapid rise of water, heavy smoke and complete darkness, was instrumental in the rescue of personnel from the flooded compartments... without regard to his personal safety or his injuries; he assisted in the rescue ... AR 210

As his shipmates testify, this does not fully or adequately describe Lockwood's activities following the torpedo explosion. Master Chief Stan White testifies to the full facts: "As men began streaming out the hatch from the Comm. Space, they were reporting Gunner Lockwood was organizing the survivors and leading them out.... making sure the wounded were assisted up the ladder, and keeping the survivors in a disciplined orderly manner. When the last wounded emerged from the space. Lockwood himself came out, helping a seriously wounded get up the ladder. Everyone was reporting it was living hell down there, with blood, seawater, broken pipes, mangled files and equipment, and body parts all over the place. Lockwood's face was badly burned by the

blast, and peppered with bits of gun powder and shrapnel from the explosion. I urged him to get medical attention for his burns, but he just turned and went back down the ladder. A few minutes latter, Lockwood was coming back out of the hatch, assisting still another wounded man from his unit. By now, Lockwood was covered with blood and seawater. Surprisingly, he went back down into the space. I learned later that someone then dogged the hatch to maintain the water tight security of the vessel. When Lockwood came back up the ladder and found it secured, he raised bloody hell, finally getting attention of personnel close to the hatch, who undogged it for him. Lockwood, after cursing out those who had dogged the hatch, told them to leave it open, that he had just dropped a wounded man trying to get it open. He went back down and returned with a shipmate on his back. The fellow was in a very dazed condition, and was sent to the medics immediately.... Even then Lockwood insisted on going back down into the space to be certain there were no living survivors. When he came back, he was very depressed, but reported the crew still down there were all dead. Lockwood then began to apply himself, almost like a robot, to assisting in caring for the wounded. To me it seemed he was in a daze and that he had to keep going or feared he would lose control of himself." [4]AR 362-365, 287

Shockingly, no U.S. forces responded to the Liberty's may-day messages. The crew latter learned Navy units began to respond but were ordered to stand down by

[4] It is little wonder the survivors, with the exception of the CO , felt Lockwood deserved the Congressional Medal of Honor, and it is not surprising he developed a fixation over the perceived injustice of not being awarded the honor.

authorities in Washington. Ultimately, some 20 hours after that attack[5], Navy units arrived to assist in treating the wounded, while the ship limped back to Malta. AR 148, 275, 278. As the ship headed for Malta, the crew were joined by the vanguard of a Court of Inquiry appointed to investigate the attack on the Liberty. The crew expected that the treachery and viciousness of the attack would be published for the world to see the butchery of the Israeli attack. The damage to the ship was ample evidence this was a planned, coordinated, murderous attack, intended to kill the crew and sink the ship. After battle shipyard examination of the Liberty established some 821 fist sized holes from missiles and cannon shots, fragment damage too numerous to count, more than 1000 holes in the ship from machine gun hits, and, the tell tale scorching from napalm attacks. AR 154-155, 276,277, 279, 280, 281, 319, 320, 322-325.

The crew quickly learned the Inquiry had a different agenda. The President of the Court issued Silencing Orders threatening the survivors with courts martial and punitive action if they discussed the events on the Liberty with any one, "not even your wives."[6] The Court declined to take testimony of the crew when they attempted to discuss their efforts to communicate with the attacking Israeli forces, and cut off and excised testimony concerning efforts of the attackers to destroy the life rafts, that the flag was clearly displayed by the ship, the obvious planning and coordination with which the

[5] The first non Israeli assistance was from a Soviet destroyer that stood by in case of need until U.S. Navy ships finally arrived.

[6] When defendant released its non classified version of the Report and attendant press release, defendant issued new silencing orders to the crew prohibiting them from discussing the events other than as reported in the Report and press release. These documents described the attack as short lived, the result of mistaken identity, and discontinued as soon as it was recognized as a U.S. Navy ship. The Liberty's Plan of the Day reporting this new silencing order is of record in Six v. U.S., 04-CV-1727, now pending before Judge Hewitt.

attack was executed, and, the strength and duration of the attack. When the Liberty arrived at Malta they learned that the Inquiry had adopted and reported as fact the lies of the Israeli government that the attack was a short lived case of mistaken identity, discontinued as soon as the vessel was recognized as a U.S. Navy Ship.[7] This treachery deceit by defendant enraged plaintiff and all other survivors.

His wife describes that Lockwood was "bitter and angry" when he returned to his quarters in Germany following the attack. , that " he would awake at night in cold sweat, screaming about dead people, floating bodies, and about water drowning him" , and when asked as to what had happened, would get angry, and growl that he was forbidden to discuss it. And, that Lockwood began drinking more heavily. Lockwood vividly describes these flashbacks and nightmares .AR 147-162. The Liberty's Medical Officer, confirming the Silencing Order, describes Lockwood's condition following the attack, and, the horrific scene he encountered when he was compelled to enter the Comm. Space to identify the dead, AR 348-358 Then Lt. Ennes describes his dealings with Lockwood as Division Officer in the years immediately following the attack, confirming the Silencing Order and he describes its affect on Lockwood and the other survivors, and relates how Lockwood would discuss how the attack was affecting his daily life; that Lockwood would become highly agitated and tearful when discussing the attack, and

[7] The Board treats the conclusions of the Report as fact and has declined to produce defendant's records of that Report and all related government records. This conclusion stands in sharp contrast to the conclusions of Dean Rusk, then Secretary of State, and, his Deputy Secretary, George Ball, of ADM Moorer, then CNO, VADM Geist, then COMSIX, then CIA Director Richard Helms, RADM Kidd and CAPT Boston, respectively President and Legal Counsel of the Court of Inquiry, and, of former NSA Directors LTGEN Odum, ADM Inman, and Marshall Carter..

how Lockwood related experiencing nightmares and difficulty sleeping, describing waking up and seeing the faces of buddies blow away by the blast, feeling a sense of guilt for having survived when so many of their shipmates had been killed, and became especially emotional when these thoughts came over him.. AR 359-361 His fellow NAVSECGRU colleague describes how when Lockwood and his fellow survivors returned from the Liberty, "They were all changed individuals... " and "were obviously 'screwed up' and how they complained they were prohibited from speaking of the attack. Dixon describes how Lockwood changed from a guy who, before the attack, would walk away from someone teasing him, to a guy who would "explode in a rage" and "become dangerously close to losing it."AR366-67

Despite the severe mental and physical trauma Lockwood experienced in that attack, he was subsequently detailed for duty in Vietnam. There he was troubled by what he viewed ad the terrible death and maiming of seemingly innocent civilians, especially old folks, women and children. These thoughts and scenes became part of his continuing nightmares and flash backs. In attempt to control the flashbacks and nightmares, he began drinking more and more. In Vietnam, he was further traumatized , experiencing the crash landing of the helicopter he was riding when it was shot down by enemy fire, experiencing his unit being attacked by a sapper attack with the satchel of explosives carried into the compound by a Vietnamese youngster not much older than his son, and, frustration over the Marines refusal to allow him to adopt and send home a Vietnamese orphan who hung around Lockwood's unit.

When Lockwood returned from Nam. His wife describes him as "a nervous

wreck, having trouble sleeping at night, waking up screaming and crying, mumbling about floating bodies in the Comm Space, and kids he'd seen in Nam. She states he "was impossible to deal with"... his "attitude towards the children ... was so severe. His "confrontational attitude towards John continued." "Things were very difficult. Bryce's sullen, angry, withdrawn attitude made it difficult to bring him back into the family ...His relationship with the kids became strained. He became physical with our youngest son, then six ears old." AR 124-130

Lockwood began experiencing indistinct pain in his legs, back and throughout his body. His superiors directed him to a medical board and eventually he was presented to a physical evaluation board, which found him unfit for duty, by reason of Arthralgia, rated as 20% disabled. He did not appeal the board and was discharged, with separation pay. While his discharge was pending, he presented to sickbay with complaints described as "depression and Anxiety". He was advised these were the normal experience of individuals awaiting discharge. There is no evidence in the record that at any time, including his post board visit to the medics, was any inquiry made concerning the physical and mental trauma he had experienced on board the Liberty and in Nam. Indeed it does not appear that the M.E.B., the P.E.B., or the doctor diagnosing his depression and anxiety ever reviewed his personnel records or ever considered how this prior trauma might relate to his observed symptoms. At no time did defendant inform plaintiff or his family that these experiences had a high probability of inducing mental disease, including depression, anxiety, rage, uncontrollable anger, lability, sexual dysfunction, nightmares, flashbacks, survivor's guilt, or other symptoms of shock, now diagnosed as Post

Traumatic Stress Disorder. Instead defendant defrauded plaintiff and denied him the treatment he needed and was entitled to, by falsely representing that his symptoms were the "normal" experiences of his pending career change, and, in disregard of its medical professional responsibilities, wholly failed to inquire concerning,, evaluate, diagnose, treat and rate these symptoms of what is now called PTSD. Thus, at no time prior to the Correction Board denial of his application for correction of his Marine Corps records have these issues been considered by a board.

Lockwood's PTSD continued to disrupt his life in the years following his discharge. On October 1, 1998, Lockwood submitted his Application for Correction of Military Record to the Board for Correction of Naval Records on October 1, 1998. The Board denied the application on October 11, 2000. Following unsuccessful requests for reconsideration, Lockwood filled his complaint in this Court on July 27, 2006. On these facts, defendant here moves for dismissal asserting this is an appeal from the April 14, 1972 action of the PEB, and barred by 28 U.S.C. Section 2501, the governing statute of limitations, which it alleges expired on April 14, 1978. We respectfully submit that defendant's multiple acts of misconduct, fraud and deceit tolled the statute, and, the governing date for limitations purposes is the date of the Board's first denial of his application, The Complaint herein was filed within the governing statutes and is not time barred.

## ARGUMENT

## Jurisdiction

This matter arises on plaintiff's claim for military disability retirement benefits under 10 U.S.C. 1201, a "money mandating" statute. The Court's jurisdiction is established at 28 U.S.C. 1491 (2000), *Fisher v. U.S., 402 F. 3d. 1167, 1173 (Fed. Cir. 2005) (en banc.)*

## Standard of Review

In acting on a dismissal motion, the court assumes the allegations in the complaint are true and construes them in plaintiff favor. *Henke v. U.S., 60 F.3d 795, 797 (Fed. Cir. 1995)* The disputed facts of this record make defendant's motion, at best, premature and inappropriate, and require its denial.

## Plaintiff's Claim Not Barred By 1972 PEB

Defendant asserts plaintiff's claim accrued on the date of his 1972 PEB. Under governing precedent that action failed to inform plaintiff of his potential disability rights. That Board informed plaintiff only that his disabilities from Arthralagia were ratable at 20%; insufficient for disability retirement benefits. The Board did not evaluate or consider his mental health disability symptoms. Indeed, subsequent to the PEB, but prior to his discharge, plaintiff was diagnosed as experiencing depression and anxiety, but informed these were non disabling, merely transient reaction to his pending career change. In *Chambers v. U.S., 417 F. 3d 1218, 124 (Fed. Cir. 2005)*, the Circuit establishes that for a military disability retirement claim to accrue, the serviceperson must know the facts of his/her diagnosis; that the same is disabling; that it was service

incurred, and, that his/her disabilities are ratable as 30% or higher. Here, at the time of the PEB action, Lockwood's mental disorder was not addressed by that PEB; prior to his discharge he was wrongfully informed that his diagnosed emerging mental health disabilities were a situational, transient depression and anxiety relating to his pending discharge; that it was not ratable; and, the subsequent denial of his VA claims presented contemporaneous with his discharge reinforced that understanding. Plaintiff did not know, indeed could not know his mental problems were in fact disabling signs of PTSD , a diagnosis not recognized in the medical community until the publication of the 1980 revisions to the DSM. *Real v. U.S., 906 F. 3d 1557, 1560 (Fed. Cir. 1990)* establishes there are circumstances that preclude disability claims from accruing. *See also: Harper v. U.S., 310 F.2d 405, 159 Ct. Cl. 135 (1962), Proper v. U.S. 154 F. Supp. 317, 138 Ct. Cl. 511 (1957), Diazlo v. U.S., 230 Ct. Cl. 506 (1982) , and, Furlong v. U.S. 152 f. Supp. 238, 240-241 (Ct. Cl. 1957)* .Those circumstances Plaintiff submits are clearly established in this record.

## Limitations Statute Equitably Tolled.

Plaintiff acknowledges *28 U.S.C. 2501* normally imposes a 6 year limitation on Tucker Act claims. Contrary to defendant, time limits are not properly typed as jurisdictional. *Arbaugh v. YTTT Corp, 126 U.S. 1235, 1242 (2006). See also: Scaborough v. Principi, 541 U.S. 401, 414 (2004).* Limitations statutes can be tolled in certain circumstances *Urie v. Thompson, 367 U.S. 163, 169-170 (1949); Contrell v. U.S., 42 Fed. Cl. 144, 154 (1998); Japanese War Notes Claimants Ass'n. v. U.S., 373 f. 2D 356, 358-359 (1967), cert. denied, 389 U.S. 971(1971).* To toll, plaintiff must show the

reason evidence was previously unknown, or, that the facts were concealed by the defendant. *Glover v. U.S., 88 U.S. 342 (1874)* , or, the injury is "inherently unknowable" at the accrual date. *Entendencia v. U.S., Fed. Cls. Docket 06-5150, Fed. Cls. , decided 03-19-2007.* It is "hornbook law" that limitation periods are customarily subject to equitable tolling, *Bailey v. West (Principi), 160 F. 3d 1369 (1998), Young v. U. S. 535 U.S. 43 (2006)* in the same circumstances of availability in analogous private suits, absent expressed statutory intent equitable tolling does not apply. Whether equitable tolling applies in a particular case involves application of law to facts, because it frequently requires not only a decision as to what legal principle applies but also an assessment of the facts and a decision as to whether application of the governing legal principle to those facts requires tolling of the limitation policy. *Leonars v. Grober, 223 F. 3d 1374 (Fed Cir. 2000); Jaqauy v. Principi, 304 F. 3d 1276 (Fed. Cir. 2002) ( en banc.)*

Clearly, in equity, defendant's misconduct in publishing a knowingly false report of the attack on the U.S.S. Liberty; its issuance of silencing orders to conceal the falsity of the report; the resultant effect of those orders precluding defendant and other Liberty survivors from seeking treatment for the mental disabilities resulting from the trauma of the attack; defendant's continuing failure to respect and protect that crew; its false representation to plaintiff that his depression and anxiety were transient reactions to his pending discharge; and, its continuing failure to inform plaintiff and his fellow Liberty survivors that the physical and mental trauma incurred in that attack likely subjected him and them to disabling PTSD, surely toll the limitations policy.

## Board Waived Its Discretionary Limitations Policy

The statute is clear. The Board has the power to waive applicable limitations when deemed in the interests of justice. The Board effectively waived any limitations policy when it undertook to review and decide the merits of plaintiff's Application for Correction to establish his 10 USC 1201 military disability rights. Plaintiff, of course, asserts in its review, the Board acted arbitrarily and capriciously in disregard of the substantial evidence of record. That issue is not now before the Court in this dismissal motion. This record is also clear, at no time did the Correction Board invoke its discretionary limitations policy. To the contrary, on 3 distinct occasions it reviewed and denied plaintiff's Application, not because it was time barred; rather the Board denied it on its merits. Defendant's counsel's belated effort to substitute its judgment for the Board's exercise of its statutory authority cannot prevail. This dismissal motion must be denied. Plaintiff is entitled to review of the Board' arbitrary and capricious denial of his application.

## Conclusion

Plaintiff respectfully submits defendant's dismissal motion must be denied.

Respectfully submitted,

William J. Kenney
D.C. Bar No. 99267

Attorney for the plaintiff
Bryce F. Lockwood

%HART/HTC
600 Pennsylvania Avenue, SE, Suite 105
Washington, DC 20003
Tel: 202 -547 - 5129
Fax: 202 -547 – 8311

9915 Empire Woods Court
Charlotte, NC 28277
Tel/Fax: 704-341-4781

## Certificate of Filing

I hereby certify that unedited copies of the foregoing "Plaintiff's Answer In Opposition To Defendant's Motion To Dismiss" were faxed to defendant's counsel, and to the Court's chambers, on July 3, 2007, and, that on July 6, 2007, a copy of the edited Answer was filed electronically, it being understood that copies of this filing will be sent to all parties pursuant to the Court's electronic filing system.

**William J. Kenney**